**OLSHAN GRUNDMAN FROME**
**ROSENZWEIG & WOLOSKY LLP**
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Adam H. Friedman
Eric Goldberg
Fredrick J. Levy
212.451.2300

*Counsel to Robert Gladstone, Lucille Gladstone,*
*John Lesher and Andrew Harris*

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MADISON 92nd STREET ASSOCIATES, LLC, | Case No. 11-13917 (SMB) |
| Debtor. | |

## MOTION FOR DISMISSAL, APPOINTMENT OF A CHAPTER 11 TRUSTEE OR APPOINTMENT OF A CHAPTER 11 EXAMINER

Robert Gladstone ("Gladstone"), as Co-Managing Member of the above-captioned debtor and debtor-in-possession (the "Debtor"), Lucille Gladstone ("L. Gladstone"), John Lesher ("Lesher"), and Andrew Harris ("Harris") as members of the Debtor (Gladstone, L. Gladstone, Lesher, and Harris together referred to as "Movants") move this Court (the "Motion") for entry of an order dismissing the case pursuant to 28 U.S.C. § 1112(b), or, in the alternative, appointing a chapter 11 trustee, pursuant to 28 U.S.C. §1104(a)(1) and (2), or a chapter 11 examiner, pursuant to 28 U.S.C. §1104(c)(1).  In support of this Motion, Movants respectfully state as follows:

## Introduction

1.       The Court should either dismiss this case or appoint a chapter 11 trustee or examiner because the Debtor's purported Co-Managing Members, 92nd St. Hotel Associates LLC ("Hotel Associates"), controlled by Louis Taic ("Taic"), and JKNY, LLC ("JKNY"), owned by Jeffrey Kosow ("Kosow" and together with Hotel Associates, the "Alleged Co-Managing Members") have (a) filed this bankruptcy case without corporate authority in direct contravention of the provisions of the Debtor's Operating Agreement (as defined below), and (b) have breached their fiduciary duty to the Debtor and its members by knowingly violating the Debtor's Operating Agreement, by Hotel Associates reneging on its commitment to sign a fully-negotiated $86 million stalking horse sale contract which would have paid creditors in full and provided a significant return to equity and engaging in a strategy to "squeeze" Movants to sell their membership interest at a steep discount.

2.       Immediate action is required, as the Alleged Co-Managing Members are using the bankruptcy court to usurp corporate authority and to advance their own agenda, to the detriment of their partners.  In fact, Movants learned one day prior to filing this Motion that the Alleged Co-Managing Members have secretly signed a financing term sheet as "Key Principals" of the Debtor, which attempts to remove Movants entirely from ownership of the Debtor's sole asset.

3.       As explained below, just hours before the bankruptcy filing, the Alleged Co-Managing Members purported to complete an illegal "hostile takeover" of the Debtor, by attempting to remove Gladstone from his position as Co-Managing Member and to replace him with Kosow through a "Special Meeting" of the Debtor's members.  This is a clear violation of the Operating Agreement because such removal and replacement of a Co-Managing Member requires a formal amendment approved by all of the members.  The actions taken by the Alleged

2

Co-Managing Members have no legal effect, and the Petition they signed falsely represents to the Court their status and authority.

4.      Moreover, the takeover is contrary to the fundamental underpinnings of the partnership.  Kosow is Gladstone's former employee, since terminated for cause, who received his membership interest prior to his termination as a bonus from Gladstone and Lesher under terms which specifically prohibited him from any participation in the Debtor's decision making process.[1]  Gladstone is the principal of Madison Equities LLC, the development company which conceived of and developed the project that included a thirty-two story apartment building at the corner of 1st Avenue and 92nd Street, as well as the adjoining lot on which the Hotel (as defined below) sits.  Together with Lesher, he is the founder of the Debtor and creator of the Hotel. Gladstone brought in Taic (together with Michael Fischer, as described below, "Hotel Associates") as an investor/member after the development project was long under way.  Before Hotel Associates joined the Debtor, all decisions were made solely by Gladstone as Managing Member.  Once Hotel Associates was admitted, all Debtor decisions required the agreement of both Gladstone and Taic.  This included the General Electric Capital Corp. ("GECC") mortgage, which made Gladstone and Taic personally liable if the Debtor filed a bankruptcy, and which prohibited the removal of either as Co-Managing Member without GECC's consent.  Thus, the actions of the Alleged Co-Managing Members, in their attempt to seize control of the Debtor, are not only impermissible under the Debtor's Operating Agreement, they are contrary to the very essence of the partnership.[2]

---

[1]   According to the terms of  the gift set forth in the Admission Agreement (as defined and described below), Kosow is neither entitled to give his consent to Gladstone's removal, nor is he eligible to be a Co-Managing Member.
[2] The improper removal of Gladstone as Co-Managing Member, and substitution of JKNY, is also an express violation of the Debtor's loan agreement with GECC.

3

5.      Gladstone's removal and the appointment of JKNY in his place was not authorized under the Operating Agreement.  Accordingly, Gladstone is still a Co-Managing Member.  Gladstone has not consented to this filing, and thus the Alleged Co-Managing Members have filed this bankruptcy without corporate authority, since the consent of both of the Debtor's Co-Managing Members is required by the Operating Agreement.  Therefore, the petition must be dismissed.

6.      Taic's hostile takeover is a bad faith attempt to break a deadlock between Taic and Gladstone as the Debtor's Co-Managing Members.  Underlying the deadlock is a fundamental disagreement that recently emerged as to how the Debtor should proceed in the face of a $74 million Consensual Foreclosure Judgment[3]  (as defined and described below) against it and how the Debtor should respond to offers to purchase its Hotel, the Debtor's sole asset. Most particularly, at the last minute and after a protracted negotiation, Taic refused to sign a fully-negotiated $86 million stalking horse sale contract (the "Sale Contract"), which will pay creditors in full and provide a significant return to equity.  Taic's refusal came after he had fully participated in the sale negotiations and had actually agreed to the Sale Contract -- just as he had agreed to the retention of a broker to market the Hotel and agreed to the retention of counsel to negotiate the Sale Contract.  This breach of his fiduciary duty was compounded by his follow-up, brazen offer to buy out Movants for substantially less than they would realize in the agreed-upon Sale Contract.  Furthermore, it was revealed shortly before the filing of this Motion that Taic and Kosow have secretly signed a term sheet for a "financing alternative," which excludes Movants entirely from ownership of the Debtor.

---

[3]Despite statements to the contrary in the Debtor's Local Rule 1007-2 Declaration (the "First Day Declaration), Taic explicitly consented to the entry of the foreclosure judgment on behalf of Hotel Associates.  This is just one of the outright falsehoods in the First Day Declaration.

4

7.      Faced with this deadlock and breach of fiduciary duty, Gladstone and Lesher commenced an action in Delaware Chancery Court against Hotel Associates (the "Delaware Action"). The Chancery Court granted a motion for an expedited trial on August 23, 2011, the day before the scheduled foreclosure sale. The Chancery Court promised a decision from the bench at the conclusion of the trial. Apparently, Taic was unwilling to resolve the deadlock legally and instead used the improper "Special Meeting" to file this unauthorized bankruptcy. The fact that, unbeknownst to Gladstone, Taic was already signing lender documents with Kosow as "Key Principals" demonstrates that he regarded the Special Meeting as a mere cover for actions he had already taken. Taic also ignored Gladstone's proposal that he and Taic agree to a bankruptcy filing by independent counsel[4] in which the two Co-Managing Members could file competing plans of reorganization. By their improper filing, Hotel Associates and JKNY have now endangered the Debtor and breached their fiduciary duty to the company and its members.

8.      Accordingly, the case must be dismissed pursuant to Bankruptcy Code § 1112(b). Alternatively, appointment of a trustee is not only warranted under Bankruptcy Code § 1104(a)(1) for cause or § (a)(2) in the interest of the estate, it is essential. Only an independent third party can cut through the acrimony, the self-dealing and the deadlock, evaluate the alternative courses of action available to the Debtor, and determine which course is in the best interests of the bankruptcy estate. However, in the event that the Court holds otherwise, the Movants submit that the appointment of an examiner to investigate Taic's conduct, the impasse

---

[4] The Debtor's choice of bankruptcy counsel highlights the Alleged Co-Managing Members' breaches of fiduciary duty and underscores another troubling aspect of this chapter 11 filing. As explained below, Debtor's counsel has appeared on behalf of Hotel Associates in the Delaware Action adverse to members of the Debtor. Such lack of disinterestedness, while troubling in any case, is compounded in this case, where the Debtor requires the guiding hand of independent, non-conflicted counsel to advise on the significant issues presented by this case.

and the Debtor's alternative strategies and to report on same to the Court is warranted under Bankruptcy Code §1104(c)(i).

**Background**

9.        On August 16, 2011 (the "Petition Date"), the Alleged Co-Managing Members, purportedly on behalf of the Debtor, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

10.        Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as a debtor in possession.

11.        However, the Debtor does not directly manage its Courtyard Marriott Hotel, the most valuable asset of this bankruptcy estate, as described in the *Emergency Motion of Courtyard Management Corporation ["Marriott"] For an Order Pursuant ot Sections 362 and 363 of the Bankruptcy Code (I) Authorizing Courtyard Management Corporation to Use Post-Petition Revenues Generated From the Operation of the Debtor's Hotel to Satisfy Post Petition Obligations Incurred by Debtor Under the Hotel Management Agreement, (II) Authorizing the Continuing Use of Courtyard Management Corporations's Cash Management System in Accordance With the Management Agreement, and (III) Modifying the Auomatic Stay and Granting Use of Cash Collateral to Implement the Foregoing* ("Marriott Cash Management Motion", Docket no. 6).[5]

12.        In the absence of any first day motions by the Debtor, Marriott has filed the Marriott Cash Management Motion seeking court approval to continue to perform in accordance with the Management Agreement between Marriott and the Debtor to collect all revenues from the Debtor's operations and to pay all expenses, post-petition.  Unfortunately, the information in

---

[5]  Marriott has also filed a companion application, on Notice of Presentment, to file the Management Agreement under seal (Docket no. 7).

the Marriott Motion is sparse and vague as to how Marriott actually performs its duties under the Management Agreement. Movants reserve their rights to object to the Marriott Motion.

13. It is notable that, as of the filing of this Motion, the Debtor has not filed any motions in this case. It has not even sought the retention of its counsel.

14. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

<u>Facts</u>

A. <u>The Members of the Debtor</u>

15. The Debtor is a Delaware limited liability company formed on April 24, 2002. From the outset, its sole purpose has been to own the property at 410 East 92nd Street in New York City and to develop it for mixed-use with offices and a hotel. The Hotel is now a 226 room Courtyard by Marriott.

16. Movant Gladstone was the co-founder of the Debtor. In 2000, he began working to develop part of 92nd Street between York and First Avenues. He and Lesher acquired the land and numerous air rights parcels in 2001. On this land, in addition to the Hotel owned by the Debtor, they provided two sites for not-for-profit organizations and one for an apartment house. This was accomplished by Madison Equities LLC ("Madison Equities"), which is 100% owned by Gladstone. Gladstone currently owns a 32.176% interest in the profits of the Debtor and his is the single largest individual member interest.

17. Movant Lesher is a co-founder of the Debtor and a longstanding employee of Madison Equities. He is a member of the Debtor and currently owns an 8.569% interest in its profits.

7

18.     Movant L. Gladstone is the co-founder of Madison Equities and the mother of Gladstone.  She is a member of the Debtor and currently owns a 5% interest in the Debtor's profits.

19.     Movant Harris is a member of the Debtor and an employee of Madison Equities who currently owns a 1% interest in the Debtor's profits.

20.     Hotel Associates is a Delaware limited liability company that was admitted as a member of the Debtor under the Second Amendment to the Operating Agreement (as defined below), dated as of April 13, 2004 (the "Second Amendment", attached hereto as Exhibit "B").  Hotel Associates currently owns a 50% interest in the profits of the Debtor, which interest is split in half.  As described in Section 6 of the Second Amendment, Hotel Associates is owned 50% by a Trust for Taic's children and 50% by 92nd Street Equities Corp. ("92nd Street Equities").  Michael Fischer ("Fischer") is the principal of 92nd Street Equities.  At least until recently, Fischer has had little direct participation in the affairs of the Debtor.  Hotel Associates' participation in the Debtor has been through Taic.  Although Taic is not himself a beneficial owner of Hotel Associates, Section 7 of the Second Amendment provides that "in all events, other than Taic's legal incapacitation, Taic shall have voting control over Hotel Associates."

21.     JKNY is a New York limited liability company and a member of the Debtor which currently owns a 3.255% interest in the Debtor's profits.  Kosow is the sole owner of JKNY.  When Kosow was an employee in good standing of Madison Equities, Gladstone and Lesher gifted to Kosow his interest in the Debtor as a bonus.  Subsequently, Kosow was terminated from Madison Equities for cause.[6]  As set forth in the Admission Agreement

---

[6] Gladstone and Lesher reserve their rights to contest whether the assignment of a portion of their interest in the Debtor to Kosow can be rescinded because of the circumstances of the gift or his current conduct.  It was inconceivable to Gladstone and Lesher that their gift of future profits of the Debtor could ever be used as a sword against them.

8

described below, Kosow's admission to the Debtor was a token gift for no entry fee. The gift was premised and conditioned on Kosow having no voting or consent rights and his continuing to work towards the interests of Gladstone, Lesher, and Madison Equities.

**B.     The Debtor's Limited Liability Company Agreement and Governance**

22.     The Limited Liability Company Agreement of Madison 92nd Street Associates, LLC (the "Original Operating Agreement", attached hereto as Exhibit "A") was entered into on or about April 18, 2002, and has been amended eight times and is also subject to an admission agreement admitting JKNY (the "Admission Agreement", attached hereto as Exhibit "C"). The Original Operating Agreement, all of the eight amendments thereto and the Admission Agreement are collectively referred to herein as the "Operating Agreement".

23.     *The Appointment of the Co-Managing Members.*  In the Original Operating Agreement, "Managing Member" was defined as Gladstone. Paragraph 10.8 of the Original Operating Agreement provides that it can only be amended by the unanimous vote of the members. Subsequently, the members did amend the Operating Agreement and designated Gladstone and Hotel Associates as equal "Co-Managing Members." *See* Section 2 of the Fifth Amendment to the Operating Agreement, dated as of November 16, 2006 (the "Fifth Amendment", attached hereto as Exhibit "D"). The only way to remove or replace either Gladstone or Taic as Co-Managing Members is to formally amend the Fifth Amendment by which they were appointed. Section 10 of the Fifth Amendment provides that it may not be "modified, changed, amended or supplemented except by written agreement signed by the parties hereto." The unanimity requirement for amendment of the Operating Agreement was reaffirmed in Paragraph 2 of the Sixth Amendment, Paragraph 3 of the Seventh Amendment and Paragraph 11 of the Eighth Amendment. Based thereon, neither of the Co-Managing Members can be

removed without the unanimous consent of the all of Debtor's members at the time of the Fifth Amendment.

24.     *The Authority of the Co-Managing Members.*  Gladstone and Taic are the two primary members of the Debtor.  Since Hotel Associates' admission, actions by the Debtor have required Taic and Gladstone to agree.  Section 2 of the Fifth Amendment to the Operating Agreement requires two levels of consents for Debtor action.  First, there must be consent by 51% of the voting members (which does not include JKNY, pursuant to the Admission Agreement).  Second, there must be the consent of both of the Co-Managing Members.  Section 2 of the Second Amendment provides, in pertinent part, as follows:

> All actions, contracts, documents and agreements on behalf of the Company may only be signed after Members having at least fifty-one (51%) of the Percentage Interest of the Company have approved same **and if the Co-Managing Members wish to sign same they may only do so jointly**. Neither Co-Managing Member shall have any authority to execute, on behalf of the Company, any document, agreement or check by itself. (emphasis supplied)

25.     Accordingly, the Fifth Amendment makes clear that the mutual consent of both Co-Managing Members is necessary for Debtor action, including the appointment/removal of a Co-Managing Member.  Moreover, Co-Managing Member appointment/removal is an action by the members that can only accomplished by their formally amending the Operating Agreement, which requires unanimous consent of the members.

26.     *The JKNY Admission Agreement.*  As set forth in Section 1 of the Admission Agreement, no capital contribution was required for the JKNY membership interest, however, Kosow agreed that JKNY would forego the most important governance rights of members. Section 1 provides (emphasis supplied): "[JKNY] shall have no authority to make any decisions on behalf of the [Debtor], and waives its right of approval regarding Sections 6.4, 8.2(b) and (d)

10

and 9.2 of the [Original Agreement]."[7]  Based upon these waivers, JKNY is not eligible to (i) vote for, (ii) be a Co-Managing Member decision maker, or (iii) vote or act in contravention of the Operating Agreement, including replacing Gladstone as Co-Managing Member.

27.     Further, Section 4 of the Admission Agreement provides that it may not be "modified, changed, discharged or terminated except by the written agreement of all of the parties hereto."  Accordingly, the limitations on JKNY's rights and participation in the governance of the Debtor can only be lifted or modified by the unanimous consent of the members.  No such consent was given.

28.     *The GECC Amendment*.  Section 1 of the Seventh Amendment to the Operating Agreement, dated May 2008 (the "Seventh Amendment", attached hereto as Exhibit "E"), provides that so long as the GECC loan (discussed below) is outstanding, the Debtor may not do, *inter alia,* the following without GECC's consent: dissolve or liquidate, sell, lease or dispose of all or substantially all of the assets, or incur any debt, secured or unsecured, other than trade debt (emphasis added).

## C.     The Marriott Management Agreement and Lawsuit

29.     In or about October 2002, the Debtor entered into a 20 year management agreement with Courtyard Management Corporation, a subsidiary of Marriott International, Inc. ("Marriott"), pursuant to which Marriott would operate the Hotel as a Marriott Courtyard (the "Marriott Management Agreement").

---

[7]Those sections, which mandate consent of all members of the Debtor for the following actions.  Section 6.4 requires approval of all members to act in contravention of the Operating Agreement, subject other Members to personal liability, admit new Members or require additional capital contributions.  Section 8.2(b) of the Original Operating Agreement provides for written consent of all Members to dissolve or terminate the Debtor.  Section 8.2(d) of the Original Operating Agreement requires the consent of all remaining Members to continue the Debtor upon "the death, retirement, insanity, resignation, withdrawal, expulsion, Bankruptcy, dissolution of a Member".  Section 9.2 of the Original Operating Agreement requires consent of all of the Members for any Member to transfer all or part of its interest in the Debtor.

30.     In August 2006, the Hotel was opened.  Marriott has continued to manage the Hotel under the Marriott Management Agreement since that time.

31.     In 2009, the Co-Managing Members, on behalf of the Debtor, retained counsel with regard to the Debtor's relationship with Marriott.  On or about September 9, 2009, the Debtor commenced an action against Marriott in New York State Supreme Court alleging various counts of breach of contract and fraud.  Marriott's motion to dismiss has now been fully submitted and is *sub judice*.  Based upon limited, recent discovery, the Debtor will be amending its complaint to expand and enhance its claims and allegations against Marriott.

32.     Essentially, the Debtor has learned that Marriott abused its position as manager of the Hotel to protect and enhance its other hotels.  Marriott entered into agreements with the union representing most of the Hotel's workers, which protected other Marriott hotels from unionization at the expense of the Debtor's Hotel, and agreed to overstaffing of the Hotel. Marriott kept these agreements hidden from the Debtor.  In addition, Marriott has neglected its obligation with regard to certain taxes owed by the Hotel and in an effort to hide its malfeasance has even forged the signature of the Debtor on various documents including a power of attorney.

**D.     The Mortgage and Consensual Judgment of Foreclosure**

33.     On or about May, 2008, the Debtor refinanced the Hotel by entering into a first mortgage loan with GECC in the principal amount of $62 million with a term of 5 years (the "Mortgage").  Taic and Gladstone both personally guaranteed the Mortgage.[8]  Section 8.3 of the loan agreement with GECC specifically prohibits any change in the Debtor's managing members without GECC's consent.

---

[8] The bankruptcy filing triggers the personal guaranties.  Pursuant to section 6.4(b) of the Original Operating Agreement, any action which would subject a member to personal liability requires unanimous consent of the members.

1392451-1

34.     In October 2010, following an event of default under the Mortgage, GECC commenced a foreclosure proceeding against, amongst others, the Debtor, Hotel Associates, Gladstone, Taic and JKNY (the "Defendants").  Defendants were represented by common counsel selected by Taic and who had previously represented Hotel Associates, Taic and Fischer.  On December 6, 2010, the Court overruled Defendants' opposition, granted GECC summary judgment on the foreclosure and appointed a Referee to compute the amounts due under the Mortgage.

35.     On April 27, 2011, at a hearing in the Supreme Court of the State of New York, County of New York (the "Foreclosure Hearing"), the Debtor  consented to the entry of the Consensual Judgment of Foreclosure and Sale (the "Consensual Foreclosure Judgment", attached hereto as Exhibit "G").

36.     The parties all agreed to and placed on the record at the Foreclosure Hearing that the Consensual Foreclosure Judgment could not be entered until May 18, 2011 (Transcript, p. 13, 22-23).  The purpose for the delay was to provide the Debtor a chance to sell the Hotel.  As part of the Consensual Foreclosure Judgment, the Debtor further agreed to present to GECC "any contract for sale of the Mortgaged Premises … to Plaintiff within three (3) business days of execution ….."  This requirement was placed on the record at the Foreclosure Hearing (Transcript, p. 14, 4-8) and was added onto the Report of Referee to Compute, dated April 27, 2011 (the "Referee's Report", together with the Transcript, attached hereto as Exhibit "H"), and signed by counsel for GECC and the Debtor.  Thus, it is clear that, at the time of the Consensual Foreclosure Judgment, the Co-Managing Members were committed to an imminent sale of the Hotel.

13

37.     In the First Day Declaration, Taic and Kosow falsely describe the Consensual Foreclosure Judgment as being "controversial" and "executed at the urging of [the Movants]…". (First Day Declaration at par. 10). In fact, as required by the Operating Agreement, the Consensual Foreclosure Judgment was consented to in writing by both Gladstone and Taic and confirmed in Court on the record by the Defendants' counsel.

38.     The Consensual Foreclosure Judgment as entered on May 26, 2011 fixed the Mortgage debt at $74,077,716.71. The foreclosure sale was scheduled for August 24, 2011.

**E.     The Debtor's Efforts to Sell the Hotel**

39.     On or about November 11, 2010, with summary judgment in the foreclosure action looming, the Co-Managing Members on behalf of the Debtor retained Cushman & Wakefield Sonnenblick-Goldman, LLC ("Cushman") to locate a buyer for the Hotel. Letters of intent were received from four parties. Although the sale was widely marketed, the Marriott Management Agreement and Marriott's mismanagement of the Hotel significantly impaired the sale value and no acceptable offers were received.

40.     After the Cushman sale efforts were discontinued, Gladstone found a potential buyer and the Debtor commenced discussions with it in March 2011. Counsel selected by Hotel Associates participated in those discussions and drafted the initial contract and various amendments. After conducting these negotiations with the buyer's attorneys, the law firms selected by Taic withdrew from representing the Debtor. On June 10, 2011, the Debtor, by its Co-Managing Members, formally retained new counsel to complete the negotiation of the Sale Contract and close the sale of the Hotel.

**F.    The Contract of Sale and Hotel Associates Renegs**

41.    The negotiations culminated in the $86 million stalking horse Sale Contract, dated June 15, 2011, between Madison and EGE Upper East 92 LLC, which included a $4 million deposit.  The Sale Contract calls for the payment of $86 million to the Debtor, with $80 million to be paid at closing.  Alternatively the buyer can elect to pay an earnout above the $80 million cash not to exceed $10 million.  The Sale Contract represents the unusual opportunity for the Debtor to repay all of its creditors in full and provide a distribution to equity holders.  Moreover, the Debtor had good reason to believe that, with the sale subject to higher and better offers, the final selling price would be significantly higher than the $86 million.  Indeed, while the Sale Contract is still available to the Debtor, other potential buyers and written offers have now surfaced.

42.    After the Sale Contract carrying out the Co-Managing Members' agreed-upon strategy was fully negotiated, the Debtor's counsel invited the Co-Managing Members to his office to  execute it.  Upon Taic's request, he was sent the final draft.  He refused to sign it on behalf of Hotel Associates.  He indicated that instead he wanted to consider buying out GECC's judgment lien at a discount and intended to attack the Consensual Foreclosure Judgment as entered without corporate authority, ignoring that he had given his written consent.  Abruptly, the sale was off.

**G.    Hotel Associates' Illusory Financing Offer and Taic's Buyout Offer**

43.    Shortly after Taic walked away from the Sale Contract, Gladstone heard from a third party that an unnamed Debtor insider was attempting to buy GECC's judgment, with the goal of foreclosing on the Hotel himself, then selling it to another entity, and reaping all of the profit from the deal that the Debtor had negotiated.  On June 16, 2011, Gladstone e-mailed Taic

and the other members: "It has come to my attention from an unimpeachable source that an insider(s) in our partnership is attempting to buy the [GECC] debt and to foreclose out his other partners. Are any or all of you involved in any such activity, have you attended meetings or communicated with others for this purpose, or do any of you have any knowledge of any such activity?" Twelve minutes later, Taic responded, "I am not aware of any such activity. But it is something to think about doing."

44. Later that same day, Taic apprised the Debtor's members of a financing offer that he wished to pursue instead of the Sale Contract, or any sale. Taic provided the Debtor's members with a one-page "Summary of Certain Indicative Terms – 6/15/2011" (the "Summary"). By its own terms, the Summary is non-binding, "prepared for the sole purpose of discussing an opportunity to make a loan[.]" The Summary provides for a first mortgage on the Hotel for a loan in the principal amount of $55 million, an amount insufficient to satisfy the GECC debt, which currently exceeds $74 million, and is at least $25 million *less than* the amount provided for in the Sale Contract. Under the Operating Agreement, such proposed financing requires the consent of both Co-Managing Members.[9]

45. The Summary Taic provided had the lender's name redacted. Only in the First Day Declaration did Taic and Kosow reveal that they were "working with" Westport Capital Partners ("Westport"). Incredibly, according to the Declaration, two months after the Summary, they are still only at the stage of attempting to "line up" financing and will need 45 days to complete a proposal to the Court. After repeated requests for information regarding these financing efforts, the day prior to making this motion, Debtor's counsel provided two documents

---

[9] There is a serious, additional problem with Taic's refinancing proposal which is likely fatal to it ever being adopted by the Debtor, if indeed it is intended to be adopted. As described above, under the Operating Agreement, the Debtor cannot borrow any money without the prior written consent of GECC (Seventh Amendment, ¶ 1(e)). It is highly unlikely that GECC will consent to a financing that will not take it out at or close to par.

from Westport, including a July 21, 2011 agreement counter-signed by Taic and Kosow, together with a term sheet from Ladder Capital, dated June 15, 2011 ("Ladder") (collectively, the "Westport Documents," attached hereto as Exhibit "I"). The Ladder term sheet, which is discussed in the Westport July 21 agreement, is actually the redacted Summary previously provided by Taic.

46.     The July 21 agreement is a "Summary of Terms and Conditions to confirm the interest of [Westport] . . . to acquire the [GECC debt]" in partnership with Hotel Associates and JKNY.[10]  The Terms and Conditions is dated three weeks before the Special Meeting attempted takeover and, notwithstanding that the it labels them as "Key Principals" of the Debtor, it is clear that Hotel Associates and JKNY are purporting to speak for the Debtor.  The Westport Terms and Conditions eliminates Movants interest entirely.

47.     The fact that the Terms and Conditions entirely eliminates the Movants' interest, reveals that Taic's true intent is more likely reflected by his other recent proposal -- his low-ball offers to buy out the Movants' interest in the Debtor for a net return of $2 million.  This offer makes understandable Taic's seemingly inexplicable reneging on the stalking horse Sale Contract which promised a successful conclusion to the Debtor's foreclosure, ensured that all creditors would be paid in full to the extent of allowed claims and would very likely provide members with a return substantially in excess of Taic's offer.

**H.     The Delaware Action**

48.     With the Co-Managing Members deadlocked, on or about July 11, 2011, Movants Gladstone and Lesher (together "Plaintiffs") filed a Verified Derivative Complaint (the

---

[10]  The proposed transaction anticipates buying out GECC for $63 million and makes no mention of the $74 milion Consensual Foreclosure Judgment.  The transaction outlined includes $40 million of refinancing (possibly requiring retention of a broker) and $23 million of new equity.  There is no return for the Debtor's members and only the "Key Principals" would participate in the "Newco" with Westport as its managing member.

"Complaint", attached hereto as Exhibit "J") and commenced the Delaware Action against Hotel Associates (*Robert Gladstone and John Lesher, Derivatively on Behalf of Madison 92nd Street Associates LLC v. 92nd St. Hotel Associates, LLC, and Madison 92nd Street Associates, LLC, nominal defendant;* Court of Chancery, State of Delaware, Civ. Action No. 6656 -VCL).

49.    By Count I of the Delaware Action, Plaintiffs asserted a claim of breach of fiduciary duty for Hotel Associates' failure to sign the Sale Contract and abuse of its position as Co-Managing Member of the Debtor in order to extract concessions from the Debtor's other members.

50.    By Count II of the Delaware Action, Plaintiffs sought appointment of a trustee or custodian to act on behalf of the Debtor, pursuant to section 18-111 of the Delaware LLC Act.

51.    The Chancery Court granted Plaintiffs' motion, scheduled an expedited trial for August 23, 2011, and promised an immediate bench decision. The trial has now been adjourned.

52.    On or about July 29, 2011, Hotel Associates filed its answer (the "Answer", attached hereto as Exhibit "K").[11] The Answer asserts that, *inter alia,* there is no jurisdiction in Delaware, that Plaintiffs are minority members of the Debtor with no rights, Taic never agreed to the Sale, Hotel Associates and JKNY are the majority of the Debtor owning a combined 53.22% of the membership interests, and that Hotel Associates was free to object to the Sale in its own self interest.

**I.    The Improper Notice of Meeting**

53.    On August 15, 2011, in order to carry out their takeover, Taic and Kosow, purporting to act on behalf of the Debtor, caused to be delivered to Movants a Notice of Special

---

[11] Co-counsel listed on the answer is the same firm that Hotel Associates now proposes the Debtor retain as its bankruptcy counsel.

Meeting (the "Notice", attached hereto as Exhibit "L"). The meeting was scheduled for the next day at 3:00 p.m. at the offices of Hotel Associates' counsel, (now Debtor's bankruptcy counsel).

54. The Notice specified that the meeting was called (a) to replace Gladstone as Co-Managing Member with JKNY, (b) to authorize the Debtor to file this bankruptcy, (c) to authorize Hotel Associates and JKNY to act in the Debtor's name to sign all of the documents necessary for the bankruptcy filing, (d) to authorize the retention of Hotel Associates' counsel who has appeared on its behalf in the Delaware Action as the Debtor's bankruptcy counsel, and (e) authorizing a capital call of $27,000 to pay counsel's retainer and the filing fee. There is no citation to authority in the Debtor's Operating Agreement for any of the actions to be taken, including the removal and replacement of Gladstone as Co-Managing Member.

55. In response to the Notice, on August 16, 2011, Movants' counsel sent a letter which advised Taic and Kosow that that the actions specified in the Notice were improper under the Operating Agreement (the "Responsive Letter", attached hereto as Exhibit "M"). The Responsive Letter advised that Gladstone could only be removed and replaced by a formal amendment to the Fifth Amendment by which Gladstone had been appointed and which amendment requires the unanimous consent of the members. It also advised that by reason of the restrictions placed upon JKNY's membership interest, it could not vote nor be appointed as Co-Managing Member.

56. The Responsive Letter also objected to the retention of Goldberg, Weprin, Finkel, Goldstein, L.L.P. as Debtor's bankruptcy counsel since they are not disinterested by reason of their representation Hotel Associates in the Delaware Action.

57. The next communication received by the Movants was later on August 16, 2011 informing them that the Alleged Co-Managing Members had filed the Debtor's chapter 11 case.

Since the GECC foreclosure sale was not scheduled until August 24, 2011, there was no exigency requiring Taic and Kosow to file the bankruptcy on August 16. Indeed, Gladstone had stated his willingness to consent to a bankruptcy filing, giving it proper corporate authority, if the Debtor employed independent counsel and Taic agreed that the filing would be premised upon the simultaneous submission of competing plans for a creditor vote. This offer was not even discussed. In order to control the bankruptcy case and to further their strategy of squeezing Movants to sell their interests at a steep discount to actual market value, Taic and Kosow in derogation of the Operating Agreement and the rights of Movants, filed the bankruptcy a full week before GECC's scheduled foreclosure sale.

### Relief Requested

58.     As set forth in detail below, Movants seek dismissal of the bankruptcy case pursuant to Bankruptcy Code § 1112(b) for lack of corporate authority,[12] or, in the alternative, the appointment of a chapter 11 trustee both for cause and in the best interests of the Debtor's stakeholders, pursuant to Bankruptcy Code §§ 1104(a)(1) and 1104(a)(2). In the alternative, Movants seek the appointment of an examiner, pursuant to Bankruptcy Code § 1104(c).

### Basis for Relief Requested

## I.     The Debtor's Case Should be Dismissed for Lack of Corporate Authority

59.     Section 1112(b)(1) provides that "on request of a party in interest, and after notice and a hearing . . . the court shall . . . dismiss a case under this chapter . . . if the movant establishes cause." 11 U.S.C. § 1112(b)(1). The Movants believe that there is sufficient cause to dismiss the case, as the chapter 11 filing was done without the necessary corporate authorization.

---

[12] While the Movants do not oppose a bankruptcy case filed with proper corporate authority and with an assured plan that pays its creditors in full, the instant filing is not such a case.

60.     Authority to file a bankruptcy petition on behalf of an entity is governed by state law.  *See Price v. Gurney*, 324 U.S. 100, 106 (1945); *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1258 (8th Cir. 1994) ("A person filing a voluntary bankruptcy petition on a corporation's behalf must be authorized to do so, and the authorization must derive from state law"); *In re American Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996) ("The authority to file a bankruptcy petition on behalf of a corporation must derive from state law."); *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr. D. Or. 2003) (as creatures of state law, LLCs are governed by state law and the terms of the organizational documents and operating agreements, and that the same control the question of whether the filing was authorized).

61.     Here, the Debtor is governed by Delaware state law.  Delaware state law establishes that an LLC is governed by the terms of its operating agreement.  *See* Delaware Code § 18-101(7) ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement").

62.     JKNY and Hotel Associates filed the chapter 11 petition, purportedly in the name of the Debtor, unlawfully and without the corporate authority to do so.  The terms of the Operating Agreement are controlling.  The removal and replacement of Gladstone as Co-Managing Member is improper and void.  Such member action requires their unanimous consent, because a Co-Managing Member can only be removed and replaced by an amendment to the Operating Agreement.  The Co-Managing Members were appointed by section 2 of the Fifth Amendment.  As such, the appointment can only be "modified, changed, amended or supplemented" pursuant to section 10 of the Fifth Amendment which requires "a written agreement signed by the parties hereto."  Not only does the Operating Agreement require this procedure, but this has been the Debtor's practice.  When the members agreed to remove

Gladstone as sole Managing Agent and to appoint Gladstone and Hotel Associates as Co-Managing Members, they did so by unanimously amending the Operating Agreement. Thus, the bankruptcy petition cannot be filed without Gladstone's consent. [13]

63.     When faced with circumstances similar to those presented here, courts have dismissed cases under section 1112(b)(1). *See, e.g.*, *In re Orchard at Hansen Park, LLC*, 347 B.R. 822, 827 (Bankr. N.D. Tex. 2006) (chapter 11 petition that one member of an LLC had unilaterally filed on the LLC's behalf, contrary to provision in operating agreement that precluded members of LLC from filing bankruptcy petition on its behalf without unanimous consent of all of its members, had to be dismissed); *In re Real Homes, LLC*, 352 B.R. 221, 225 (Bankr. D. Idaho 2005) ("It is generally accepted that a bankruptcy case filed on behalf of an entity by one without authority under state law to so act for that entity is improper and must be dismissed."), *In re Green Power Kenansville, LLC*, Case No. 04-08384-8-JRL (Bankr. E.D.N.C. Nov. 18, 2004) (in granting a motion to dismiss, court looked to state law and the LLC's operating agreement to determine that an LLC's bankruptcy petition was not properly authorized); *In re DB Capital Holdings, LLC*, No. 10-046, 2010 WL 4925811, at *2 (10th Cir. B.A.P. Dec. 6, 2010) ("A bankruptcy case filed on behalf of an entity without authority under state law to act for that entity is improper and must be dismissed.").

64.     In *Green Bridge Capital S.A. v. Shapiro*, Case No. 10-56158 (Bankr. D. Del. Jan. 31, 2011) (Docket No. 66), the members of an LLC were disputing who had corporate authority to control the LLC. In *Green Bridge*, the entity at the center of the controversy was a New York limited liability company, which LLC was the sole member of one of the debtors, and served as the manager for all of the debtors. *Id.* at p. 1. Thus, it was "the indirect control of Debtors,

---

[13]Also, as described in detail herein, even if Taic were correct that removal and replacement could somehow be accomplished by a 51% vote, the interest of JKNY cannot be used to achieve that 51%, as JKNY waived its voting rights under the Admission Agreement.

which [was] at the center of the adversary proceeding." *Id*. The *Green Bridge* court held that "[d]etermining authority is a question of state law, and in the case of a limited liability company is governed by the operating agreement, which defines the rights of members." *Id*. at p. 6, *citing In re Am. Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996); *Willoughby Rehab. and Health Care Center, LLC v. Webster*, No. 12431-04, 2006 WL 3068961 at *4 (N.Y. Sup. Ct. Oct. 26, 2006). The court in *Green Bridge* enforced the operating agreements' requirement of "unanimous written consent . . . to take any Material Action . . ." and accordingly held that "[one member] could not alone consent to the conversion [of an involuntary chapter 7] to chapter 11." *Id*. at p. 7. Thus, the court ultimately granted an "Order restraining [the member] from taking further action in violation of [the LLC's] and Debtors' governance instruments. Plaintiffs have established that [the LLC's] members must act by majority for actions on its behalf and by unanimity for Material Actions on Debtors' behalf," in accordance with the relevant operating agreements. *Id*. at p. 9.

65.     Therefore, for all of the above reasons, JKNY and Hotel Associates did not have the proper corporate authority to file this case on behalf of the Debtor. Dismissal of this case in accordance with Delaware state law and section 1112(b) of the Bankruptcy Code is both appropriate and warranted.

## II.     The Irreconcilable Deadlock of the Debtor's Co-Managing Members Requires the Appointment of a Trustee Both For Cause and in the Interest of the Debtor's Stakeholders

### A.     The Legal Standards

66.     Section 1104(a)(1) of the Bankruptcy Code provides that a court *shall* appoint a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the

case, or similar cause . . ." 11 U.S.C. § 1104(a)(1).  It is widely recognized that concepts such as

fraud, dishonesty, incompetence, or gross mismanagement cover a wide spectrum of conduct.

Therefore, courts have discretion when it comes to determining what constitutes "cause".  *See In*

*re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) ("section 1104(a) decisions must be

made on a case-by-case basis"), *citing Committee of Dalkon Shield Claimants v. A.H. Robins*

*Co.*, 828 F.2d 239, 242 (4th Cir. 1987); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525

(Bankr. E.D.N.Y. 1989) ("[T]he words 'including' and 'or similar cause' [in section 1104(a)(1)]

. . . indicate that the grounds for appointing a reorganization trustee are not even limited to the

derelictions specifically enumerated"); *In re Marvel Entertainment Group*, 140 F.3d 463, 472

(3d Cir. 1989) ("[C]ourts must be given the discretion necessary to determine if the debtor-in-

possession's 'conduct shown rises to a level sufficient to warrant the appointment of a trustee'").

67.     Distinct from the "cause" basis is the "interests" test.  Section 1104(a)(2) provides

that a trustee may be appointed "if such appointment is in the interests of creditors, any equity

security holders, and other interests of the estate, without regard to the number of holders of

securities of the debtor or the amount of assets or liabilities of the debtor."  11 U.S.C.

§1104(a)(2).  This test does not require demonstration of any specific instances of fraud,

dishonesty, incompetence, gross mismanagement, or anything similar, and thus a court's

determination under section 1104(a)(2) is made by applying a "flexible standard."  *Marvel*, 140

F.3d at 474.  Courts typically will "eschew rigid absolutes and look to the practical realities and

necessities."  *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)

(internal citations omitted), *quoting In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr.

S.D.N.Y. 1990).  Among the factors considered are: (i) the trustworthiness of the debtor; (ii) the

debtor in possession's past and present performance and prospects for the debtor's rehabilitation;

(iii) the confidence – or lack thereof– of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *Ionosphere Clubs*, 113 B.R. at 168 (internal citations omitted). "[Section] 1104(a)(2) reflects the practical reality that a trustee is needed [and] [w]here ... no meaningful progress towards reorganization is possible because of deep rooted animosities between a Debtor and major creditors, an independent reorganization trustee may well be necessary to insulate the reorganization process from paralytic conflict." *V. Savino Oil & Heating Company*, 99 B.R. at 527

B.      **The Deadlock is Cause to Appoint a Trustee Under Section 1104(a)(1)**

68.      Faced with facts similar to this case, courts have consistently held that when a board of directors was "in effect deadlocked," thus appointment of a trustee is warranted. *In re Advanced Electronics, Inc.*, 99 B.R. 249 (Bankr. M.D. Pa. 1989); *see also In re Petralex Stainless, Ltd.*, 78 B.R. 738 (Bankr. E.D. Pa. 1987) (appointment of trustee appropriate when the board of directors had been unable to resolve financing problems and the debtor would be unable to continue operations absent resolution of those problems, and there was a dispute over who spoke for estate of debtor); *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164 (Bankr. D. Colo. 1990)(where the debtor's members were embroiled in prepetition litigation with each other, the court pointed to "serious conflicts . . . between and among the debtor, its board and creditors [that] make the prospect for gridlock seem more probable than the ability to rehabilitate the debtor," and thus the debtor should be "placed in the hands of an experienced, capable party who can make informed and directed decisions to reorganize." *Id*. at 176-7.

69.     *Cajun Elec. Power Coop., Inc. v. Central La. Elec. Coop., Inc. (In re Cajun Power Coop., Inc.)*, 74 F.3d 599 (5th Cir. 1996) ("Cajun II"), is applicable to the facts herein.[14] In Cajun II, the Fifth Circuit found that there was cause to appoint a trustee under both the "for cause" and "interests" prongs of section 1104(a), due to the irresolvable conflicts of interest that existed between Cajun's board members.  Such conflicts included failure to collect monies owed by member-customers, and attempts to deny member-customers access to information.  In addition, the court was concerned by apparent conflicts and self-dealing in that some board members "had expressed an interest in purchasing Cajun's assets, either by themselves alone or by forming a venture with one or more others."  *See* Cajun I at 751.  Moreover, the court took notice that:

> "[t]he conflicts present in this case go beyond the 'inherent' conflicts under which all healthy cooperatives operate . . . members in healthy cooperatives [do not] consider strategies which seem designed to break-up and scavenge the assets of the debtor . . . Once cooperative members begin working at cross-purposes, to the extent Cajun's members have, the appointment of a trustee may be the only effective way to pursue reorganization."

*Id*.

70.     Likewise, in *In re New Towne Development, LLC*, 404 B.R. 140 (Bankr. M.D. La. 2009), the court found that a membership dispute similar to the dispute herein, which effectively paralyzed the LLC's management, was cause for the appointment of a trustee.  In *New Towne*, one of the LLC members and an entity he controlled filed an involuntary petition against the debtor one day prior to a scheduled sheriff's sale of the debtor's land.  Shortly thereafter, the debtor's principal secured creditor moved to dismiss or convert the case, or alternatively for the appointment of a chapter 11 trustee.  The motion to dismiss was denied, and the court examined

---

[14] Cajun II adopted on rehearing the dissent in the Fifth Circuit's prior decision, *Matter of Cajun Elec. Power Co-op., Inc.*, 69 F.3d 746, 751 (5th Cir. 1995) ("Cajun I").

whether or not the appointment of a trustee would be appropriate relief. While recognizing the factors explicitly listed as "cause" in section 1104(a)(1), the court held that "cause can consist of other factors, including an actual conflict of interest." *Id*. at 149, *quoting Cajun Power* (Cajun II), 191 B.R. at 661. The court in *New Towne* concluded that when the debtor's management was "paralyzed", it was necessary to install a "neutral third party to operate the debtor unhampered by its members' disagreements." *Id*.

71.     The conflict and impasse herein cannot be resolved within the four corners of the Operating Agreement and without the assistance, if not the leadership of, an independent party. Such deadlock constitutes cause to appoint a trustee as the impartial fiduciary to break this logjam, so that the Debtor can operate in chapter 11.

**C.     The Deadlock Also Warrants Appointment of a Trustee in the Interest of the Debtor's Stakeholders under Section 1104(a)(2)**

72.     The second prong of Bankruptcy Code § 1104 is also available to break the Debtor's deadlock. *Collier's* notes that section 1104(a)(2) could be relevant to instances where there is "a split among partners in a partnership case or directors in a corporate case which prevents the partnership or the board of directors, as the case may be, from managing the debtor's affairs would justify the appointment of a trustee . . . even though elements of fraud, dishonesty, incompetence or gross management are not present." 2 Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy*, ¶ 1104.02[3][b], at 1104-15 (16th ed. 2010).

73.     Courts have followed suit, and appointed a trustee under the "interests" prong when deadlock and irreparable conflict exists within management of the debtor. In *Matter of Tahkenitch Tree Farm P'ship.*, 156 B.R. 525 (Bankr. E.D. La. 1993), the debtor's general partner moved for the appointment of a chapter 11 trustee. Like the instant case, the two general partners of the debtor were involved in various state court litigations in which the ownership

27

interests of the debtor were at issue.  *Tahkenitch Tree Farm P'ship.*, 156 B.R. at 526.  Among

other reasons, the movant asserted that a trustee should be appointed because the debtor could

not function by vote of the two partners, due to their hostilities towards each other.  *Id.* at 527.

The court held that both the conflict between the debtor's general partners and the interests of the

estate warranted appointment of a trustee, noting that the two partners were "deadlocked on

management and control issues related to [the debtor]" and that the existence of the split among

partners justified the appointment of a trustee under the "interests" prong.  *Id.* at 528; *see also In

re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 692-93 (Bankr. E.D. La. 2006) ("when the

board of directors of a debtor corporation is effectively deadlocked, appointment of a trustee is in

the best interests of the bankruptcy estate.").

74.     For all of the above reasons, Movants believe that the appointment of a trustee is

in the best interest of all stakeholders, and will ensure that the reorganization is able to move

forward in a timely manner.

**III.     Taic's and Kosow's Self-Interested Dealings are Cause to Appoint a Trustee**

75.     Alternatively, as discussed above, section 1104 explicitly states that "dishonesty,

incompetence, or gross mismanagement of the affairs of the debtor" can be reason to appoint a

trustee for cause.  11 U.S.C. § 1104(a)(1).  Movants believe Taic and JKNY's recent actions and

self-dealings fall into these enumerated categories of "cause."

76.     Taic's refusal to sign the Sale Contract, followed by his offer to buy out the

Movants at fraction of what the Sale Contract would pay, is a text book self-interested breach of

his fiduciary duty of loyalty and good faith to the Debtor.  To date, there is no other rational

explanation of his last-minute about-face and reneging on the agreed upon sale.  Taic's secret

28

dealings with Westport have also tainted and compromised the Debtor and thereby fall squarely within the types of cause described in section 1104(a)(1).

77.     JKNY's actions are equally troubling and reveal the level of misconduct and conflicts that justify a trustee.  JKNY never had the authority to vote on any matter - yet it voted on the Debtor's resolutions used by Taic to give the bankruptcy filing the veneer of authority after having falsely represented itself to Westport as one of the Debtor's "Key Principals." JKNY likewise had no ability to remove or replace Gladstone as the Co-Managing Member, yet brazenly jumped at the chance to do so, in derogation of his limited role provided for in the Admission Agreement and the provisions of the Operating Agreement, which precluded the removal of Gladstone as Co-Managing Member without his consent.

78.     The benefits of trustee appointment – e.g., representation of the interests of all stakeholders by a neutral intermediary lacking any agenda or design, who shall conduct meaningful and productive plan negotiations – vastly outweigh any corresponding costs.  Taic and JKNY have, through their attempts to purportedly remove Gladstone from his position as Co-Managing Member and reneging on the Sale Contract, both endangered the Debtor and breached their fiduciary duty to the LLC, its creditors and its members.  These blatant violations of fiduciary duties surpass the level of "dishonesty, incompetence, or gross mismanagement of the affairs of the debtor" provided for in section 1104(a)(1), and thus appointment of a trustee for cause is appropriate herein.

## IV.     The Debtor's Inability to Confirm a Plan Is Cause to Appoint a Trustee

79.     "Cause" also exists to appoint a trustee because the members of the Debtor do not, left to themselves, have the ability to propose a confirmable plan.  Any plan will require the signature and consent of both Co-Managing Members, who are and will likely remain

29

deadlocked. To the extent the plan constitutes a sale, it will require unanimous consent of the members. To the extent the plan includes a refinancing, it requires GECC's consent, per the mandate of the Debtor's organizational documents.

80. The Debtor's members' actions, inactions, and management allegiances, surrounded by bitter fighting among all parties, "do[] not instill confidence that the [Debtor] could fairly negotiate with the creditors to whom they owe [] duties, nor that reorganization will occur effectively." *Marvel*, 140 F.3d at 474; *see also In re Cardinal Indus.*, 109 B.R. 755, 765-66 (Bankr. S.D. Ohio 1990) ("The fundamental problem in these cases is that there has been a serious and general loss of confidence in the Debtors' management. The alleged loss of confidence does not appear to the Court to be a ploy, but follows good faith efforts by the Creditors to permit the Debtors to direct their own reorganizations. The confidence problem has not resulted from one specific problem, but came about because of many events which, when seen in combination, make it appear that the Debtors are not properly in control of their reorganizations and should no longer be permitted to direct the process . . . . Further erosion resulted from the continued appearance of certain conflicts of interest . . . ."); *In re Madison Mgmt. Group, Inc.*, 137 B.R. 275, 281 (Bankr. N.D. Ill. 1992) ("lack of confidence in the debtor's management may constitute cause" under section 1104(a)(1)); *Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. at 176 (creditor's "sincere[] and justifiabl[e] lack [of] confidence in management" supported appointment of trustee under section 1104(a)(1)).

81. In another case discussed above, *New Orleans Paddlewheels*, *supra*, the court appointed a chapter 11 trustee, and in doing so, paid particular attention to the assertion that the debtor's management would not likely be able to work with those who must consent to approve its plan. *New Orleans Paddlewheels*, 350 B.R. at 692 ("Management's relationship with the

opposing equity interests is so full of acrimony, that it is highly unlikely that debtor's management could ever work with those who must consent to approve its plan").

82.     Movants have no confidence in the ability of the parties to resolve their conflicts and agree on the terms of a plan of reorganization.  In that regard, even if Taic and/or Hotel Associates is somehow able to propose a plan of reorganization, it will likely be unconfirmable, since equity will not vote to accept it with the necessary 2/3 in number and 3/4 in amount.  As a result, a cramdown of equity is impossible.

**V.      Alternatively, Appointment of an Examiner is in the Interest of the Estate.**

83.     Should this Court choose not to appoint a trustee in this chapter 11 case, Movants hereby requests that an examiner be appointed in accordance with section 1104(c).  Section 1104(c)(1) of the Bankruptcy Code provides as follows:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate;

11 U.S.C. §1104(c)(1).

84.     To determine whether appointment of an examiner under section 1104(c)(1) is appropriate, courts must determine "whether the creditors and equity security holders would be served by the appointment of an examiner and whether the costs of an examiner are not disproportionately high."  *See In re Gilman Servs., Inc.*, 46 B.R. 322, 327 (Bankr. D. Mass. 1985).   Appointment of an examiner has been deemed to be in the interests of creditors and the

31

estate when such appointment "allows for a thorough, independent, and expeditious examination to be made into serious allegations" of "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor." *In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221, at *2-3 (Bankr. E.D.N.Y. Aug. 26, 2010).

85.     Under the facts and circumstances of this case, described above, the appointment of an examiner is justified under section 1104(c)(1) because an impartial and independent examiner can evaluate and report to the Court with regard to the Debtor's deadlock and the efficacy of the alternative courses of action available to the Debtor.  Absent such a third party, the Debtor will likely remain mired in discord, unable to take action, and unable to utilize the breathing space afforded by chapter 11 to resolve its situation in the best interest of all of the stakeholders of this bankruptcy estate.

## Notice

86.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Debtor; (iii) counsel to Marriott; (iv) counsel to GECC; (v) all creditors of the Debtor pursuant to Rule 2002(a)(4) of the Federal Rules of Bankruptcy Procedure; and (vi) any other party who has filed a notice of appearance in this case.  The Debtor submits that such notice is sufficient under the circumstances.

**Conclusion**

WHEREFORE, the Movants respectfully request entry of an order dismissing the case pursuant to 28 U.S.C. § 1112(b), or, in the alternative, appointing a chapter 11 trustee, pursuant to 28 U.S.C. §1104(a)(1) and (2), or a chapter 11 examiner, pursuant to 28 U.S.C. §1104(c)(1), and such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 23, 2011

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By: _/s/ Adam H. Friedman_____
Adam H. Friedman
Eric Goldberg
Fredrick J. Levy
Park Avenue Tower
65 East 55th Street
New York, New York 10022
212.451.2300

*Counsel to Robert Gladstone, Lucille Gladstone, John Lesher and Andrew Harris*

1392451-1