Exhibit "A"

Original Agreement

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MADISON 92ND STREET ASSOCIATES, LLC

### (A Delaware Limited Liability Company)

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## MADISON 92ND STREET ASSOCIATES, LLC

### (A Delaware Limited Liability Company)

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is made this _18_ day of _APRIL_, 2002, by and between Robert Gladstone and John Lesher (each individually a "Member" and collectively the "Members").

### WITNESSETH:

WHEREAS, MADISON 92ND STREET ASSOCIATES, LLC was formed as a limited liability company under the Delaware Limited Liability Company Act on _April 24, 2002_; _JL_

WHEREAS, the Members desire to operate the limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Members desire to set forth their mutual understandings, rights and obligations in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein and intending to be legally bound, the parties hereto agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1  Definitions.

For purposes of this Agreement, the following terms shall have the meanings set forth below, except as otherwise specified or as the context may otherwise require:

"Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore (pursuant to the terms of a Member's promissory note or otherwise) or is deemed to be obligated to restore pursuant to Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the

Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

"Adjusted Capital Contribution" shall mean, as of any day, a Member's Capital Contributions reduced by the amount of cash and the Gross Asset Value of any Company property distributed to such Member pursuant to Sections 4.2 and 8.4 hereof.

"Agreement" shall mean this Limited Liability Company Agreement, as amended from time to time.

"Bankruptcy" shall mean (i) the entry of a decree or order for relief by a court having jurisdiction in respect of a Person in an involuntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of a Person or for any substantial part of such Person's property or the entry of an order for the winding up or liquidation of its affairs, which decree or order remains unstayed and in effect for a period of ninety (90) consecutive days; (ii) the commencement by a Person of a voluntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of a Person or for any substantial part of its property, or any general assignment by a Person for the benefit of creditors; or (iii) the attachment by a creditor of a Person's Company Interest, which attachment is not discharged or vacated within ninety (90) days from the date it becomes effective.

"Capital Account(s)" shall mean the individual account(s) maintained by the Company with respect to each Member as provided in Section 3.2 of this Agreement.

"Capital Contribution(s)" shall mean the amount of cash or the agreed value of the property or services (as determined by the Members and the Company) contributed by each Member to the Company as provided in Article 3 of this Agreement.

"Cash Flow" shall mean, for the period or fiscal year in which such determination is being made, the Company's net income after taxes from operations, plus depreciation and amortization expense for such period or fiscal year (as computed for income tax purposes), less principal payments on scheduled indebtedness of the Company during the period or one-year period ending on the date upon which such determination is being made (excluding payments made under any subordinated promissory notes of the Company and payments scheduled to be made under Section 4.3((c)) of this Agreement).

"Code" shall mean the Internal Revenue Code of 1986, as amended. All references to the Code or any regulations adopted thereunder, including Treasury Regulations or Temporary Treasury Regulations, are references to the Code or such regulations as they are in effect on the date hereof.

"Company" shall mean the Delaware limited liability company governed by this Agreement.

"Company Interest" shall mean a Member's share of the Profits and Losses of the Company and a Member's right to receive distributions of the Company's assets.

"Company Minimum Gain" shall have the same meaning as partnership minimum gain set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"Depreciation" shall mean, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"Gross Asset Value" with respect to any asset shall mean the asset's adjusted basis for Federal income tax purposes, except as follows:

      (i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the other Members;

      (ii)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Members, as of the following times:

      (a)     the acquisition of an additional Company Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution;

      (b)     the distribution by the Company to a Member of more than a de minimis amount of Company property other than money as consideration for a Company Interest; and

      (c)     the liquidation of the Company for Federal income tax purposes within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(9); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Members reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)     The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Section 4.3((g)) hereof: provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Board determines that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv); and

(v)     If the Gross Asset Value of an asset has been determined pursuant to subparagraphs (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Interest" shall mean a Company Interest.

"Managing Member" shall mean (a) Robert Gladstone so long as Robert Gladstone is (i) alive and not incapacitated and (ii) either owns his Interest or controls the entity which both holds the Interest and is an entity permitted to hold such Interest pursuant to section 9.1 (d) or (b) if Robert Gladstone fails to satisfy the conditions set forth in (a) above, John Lesher.

"Member" shall mean Robert Gladstone and John Lesher, and anyone else admitted as a member of the Company pursuant to the terms of this Agreement. The term "Members" shall mean all of such persons.

"Member Nonrecourse Debt" shall have the same meaning as partner nonrecourse debt set forth in Sections 1.704-2(b)(4) and 1.704-2(i) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as partner nonrecourse debt minimum gain set forth in Treasury Regulation Section 1.704-2(i) and shall be determined in accordance with the principles of such Section of the Treasury Regulations.

"Member Nonrecourse Deductions" shall have the same meaning as partner nonrecourse deductions set forth in Sections 1.704-2(i)(1) and 1.704-(2)(i)(2) of the Treasury Regulations.

"Nonrecourse Deductions" shall mean deductions having the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Treasury Regulations.

"Percentage Interest" shall mean a Member's percentage ownership interest in the Company, as set forth on Schedule A attached hereto and as amended from time to time.

"Person" shall mean any individual, partnership, corporation, limited liability company, trust or other entity.

"Profits and Losses" shall mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for these purposes, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

> (i)  Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to the foregoing shall be added to such taxable income or loss;

> (ii)  Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to the foregoing shall be subtracted from such taxable income or loss; and

> (iii)  In the event the Gross Asset Value of any Company asset is adjusted pursuant to clause (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

> (iv)  Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

> (v)  In lieu of depreciation amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period computed in accordance with the definition of Depreciation used herein;

> (vi)  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the

5

adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses;

(vii)   Notwithstanding the above, any items which are specially allocated pursuant to Sections 4.3 or 4.4 hereof shall not be taken into account in computing Profits and Losses.

## ARTICLE 2

## FORMATION AND PURPOSE

### 2.1   Formation.

The Members formed the Company pursuant to the Act. The provisions of the Act shall apply and govern the formation and operation of the Company except to the extent otherwise expressly provided in this Agreement.

### 2.2   Name.

*MADISON fee*

The name of the Company shall be 92ND STREET ASSOCIATES, LLC. The Company may do business under such other names as may be chosen from time to time by the Members.

### 2.3   Registered Agent and Registered Office in Delaware.

The registered agent and registered office of the Company in the State of Delaware will be the Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801, or at such other place as the Members may from time to time determine. The Company shall maintain such other offices as the Members shall determine. The registered office may be changed from time to time by filing the address of the new registered office with the State of Delaware as required by the Act.

### 2.4   Purposes.

*commonly Known as 410 E. 92nd Street* The purposes of the Company shall be (i) to acquire, own, and invest in property on 92nd Street and 1st Avenue, New York, New York., (ii) to develop, finance, operate and dispose of such business or any portion thereof and (iii) to make, enter into and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out the foregoing purposes.

### 2.5   Execution and Filing of the Certificate.

The Members have filed a Certificate of Formation of the Company (the "Certificate") with the State of Delaware. Whenever it is necessary or appropriate to amend or restate the Certificate, the Members may (subject to the terms of this Agreement ) timely file an amended Certificate, and the Members shall do and continue to do all other things as may be

required or advisable to maintain the Company as a limited liability company existing pursuant to Delaware law and as provided herein.

### 2.6 Other Qualifications.

The Company shall exist under the laws of the State of Delaware and, to the extent that the business of the Company is conducted in any jurisdiction other than Delaware, under the laws of such other jurisdiction to the extent necessary or desirable to do business in such jurisdiction, as determined by the Members.

## ARTICLE 3

## CAPITAL CONTRIBUTIONS

### 3.1 Initial Capital Contributions of Members.

Each Member has contributed cash to the Company in exchange for the Member's Percentage Interest, all as shown on Schedule A attached hereto.

### 3.2 Capital Accounts.

For tax purposes, a separate Capital Account shall be established and maintained for each Member in accordance with Code Section 704 and Treasury Regulation Section 1.704-1(b) and the following provisions:

> (a) Generally, the Capital Account of a Member shall consist of the Member's initial Capital Contribution increased by: (i) any additional Capital Contributions in cash; (ii) the fair market value of any Capital Contribution of property in kind (net of liabilities securing such contributed property that the Company is considered to assume or take subject to, under Section 752 of the Code); and (iii) such Member's share of Company Profits (or items thereof allocated pursuant to Article 4), including income and gain exempt from tax, and decreased by (I) distributions in cash to such Member; (II) the fair market value of property distributed in kind to such Member (net of liabilities securing such distributed property that such Member is considered to assume or take subject to, under Section 752 of the Code); (III) such Member's share of Company Losses allocated pursuant to Article 4; and (IV) such Member's share of expenditures of the Company described or treated as described in Section 705(a)(2)(B) of the Code.

> (b) If any Interest in the Company, or a portion thereof, is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

> (c) The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with

7

Treasury Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations.

### 3.3 No Return of or interest on Capital; No Partition.

Except as specifically provided in this Agreement, no Member may withdraw any amount from his Capital Account or be paid interest on his Capital Contributions or his Capital Account. No Member shall have any personal liability for the repayment of any Capital Contributions of any other Member. Each Member waives any right to partition Company property. The foregoing shall not constitute a waiver of any Member's rights upon dissolution of the Company.

### 3.4 Additional Capital Contributions.

No Member shall be required to make any additional capital contribution to the Company or to restore any deficit in such Member's Capital Account, except as provided in this Agreement, and such deficit, if any, shall not be considered a debt owed to the Company or to any other person for any purpose.

### 3.5 Company Interests.

The Company Interests of the Members shall be personal property for all purposes.

## ARTICLE 4

## DISTRIBUTIONS TO MEMBERS AND ALLOCATIONS OF PROFITS AND LOSSES

### 4.1 Profits and Losses.

(a) After giving effect to the special allocations set forth in Sections 4.3 and 4.4 hereof, Profits and Losses for any fiscal year shall be allocated in accordance with the Members' respective Percentage Interests.

(b) Notwithstanding subsection (a) and after application of Treasury Regulation Section 1.704-1(b)(2)(ii)(d), no such Losses shall be allocated to a Member which would cause such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year if, at the time, any other Member has a positive Capital Account balance. Any Losses not allocated to a Member due to the foregoing limitation shall be specially allocated to the Members with positive Capital Account balances in proportion to such Capital Account balances until all such Capital Account balances have been reduced to zero and any remainder shall be allocated to Members in accordance with their respective Percentage Interests.

4.2 Distributions.

Distributions of Cash Flow or other funds received by the Company shall be made in accordance with the Members' respective Percentage Interests

4.3 Special Allocations.

The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Notwithstanding any other provision of this Article 4, if there is a net decrease in Company Minimum Gain during any Company taxable year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treasury Regulation Section 1.704-2(f). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each of such Members pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(f) of the Treasury Regulations. This Section 4.3((a)) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Notwithstanding any other provision of this Article 4 except Section 4.3((a)), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each of such Members pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. This Section 4.3((b)) is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Member who is not obligated (or treated as obligated) to restore a deficit balance in its Capital Account unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this

9

Section 4.3((c)) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.3((c)) were not in the Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Company fiscal year that is in excess of the sum of (i) the amount such Member is obligated to restore, and (ii) the amount such Member is deemed to be obligated to restore pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.3((d)) shall be made if and only to the extent that such Member would have a deficit Capital Account balance in excess of such sum after all other allocations provided for in this Article 4 have been tentatively made as if Section 4.3((c)) hereof and this Section 4.3((d)) were not in the Agreement.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period shall be allocated among the Members in proportion to their respective Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i).

(g)     Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

4.4     Curative Allocations.

The allocations set forth in Section 4.1(b) hereof and in Section 4.3 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b). It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 4.4. Therefore, notwithstanding any other provision of this Article 4 (other than the

Regulatory Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss and deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Members' Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.1(a) hereof. In exercising their discretion under this Section 4.4, the Members shall take into account future Regulatory Allocations under Sections 4.3((a)) and 4.3((b)) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.3((e)) and 4.3((g)).

### 4.5    Tax Allocations: Code Section 704(c).

In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value. Allocations pursuant to this Section 4.5 are solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

### 4.6    Miscellaneous.

(a)    For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Members using any permissible method under Code Section 706 and the Regulations promulgated thereunder.

(b)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Company income or loss for income tax purposes.

(d)    Solely for the purpose of determining each Member's share of excess nonrecourse liabilities pursuant to Treasury Regulation Section 1.752-3(a)(3), and solely for such purpose, each Member's interest in Company Profits is hereby specified to be such Member's Percentage Interest.

### 4.7    Establishment of Reserve.

The Members shall have the right and obligation to establish reasonable reserves based on generally accepted accounting principles for maintenance, improvements, operations, capital expenditures and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company for any fiscal year as the Members may deem reasonably necessary or appropriate for that purpose.

### 4.8    Amounts Withheld.

All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article 4 for all purposes under this Agreement. The Members agree to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to Code or any provision of any other federal, state or local law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

## ARTICLE 5

## MANAGEMENT

### 5.1    Rights and Duties of Members.

The Company shall be managed by the Managing Member. Except as otherwise provided in this Agreement, the Managing Member shall have the right to act for and bind the Company in the course of its business without the approval of any other member. Each Member may designate an individual who shall be authorized to act on behalf of such Member with respect to the Company, and each Member shall, from time to time, advise the Company and each other Member of the names and offices of the persons authorized to act with respect to the Company on behalf of such Member.

### 5.2    Exculpation.

No Member as such or any officer, employee or agent of any Member or the Company shall be liable to the Company or any Member for losses or liabilities arising from the conduct of the affairs of the Company or from the conduct of any employee or agent of the Company.

### 5.3    Indemnification of the Managing Member.

(a)    The Company shall indemnify and hold harmless the Managing Member and each person who shall serve at any time as a Managing Member or an officer of the Company against all damages, losses, fines, costs and expenses (including attorneys' fees and disbursements) resulting from or relating in any way

to any claim or demand made or threatened, or any action, proceeding or investigation commenced or threatened, omitted to have been taken (or alleged to have been taken or omitted to have been taken) by such person in connection with the organization, business or other affairs of the Company (including any amounts paid or property transferred, and all costs and expenses, including attorneys' fees and disbursements, incurred in connection with any settlement of any such claim, action, proceeding, or investigation), except that such indemnification shall be made only if such action or omission of such person does not constitute willful misconduct or recklessness with respect to the matter or matters as to which indemnity is sought.

(b)     For the purposes of Section 5.3((a)) hereof, the determination that the action or omission of any person constitutes willful misconduct or recklessness shall be made by a court of competent jurisdiction or other body before which the relevant action, proceeding or investigation is pending. In the absence of a determination by such court or other body, such determination may be made by legal counsel to the Company in a written legal opinion to the Company.

5.4     Holding of Property.

Property owned by the Company shall be held in the name of the Company or in nominee name.

5.5     Loans.

Any person may, with the consent of the Members, lend or advance money to the Company. If any Member shall make any loan or loans to the Company or advance money on its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company. The amount of any such loan or advance by a lending Member shall be repayable out of the Company's cash and shall bear interest at such rate as the lending Member and other Members shall agree but not in excess of the maximum rate permitted by law. None of the Members shall be obligated to make any loan or advance to the Company.

## ARTICLE 6

### RIGHTS AND OBLIGATIONS OF MEMBERS; MEETINGS

6.1     Liability of Members.

(a)     No Member shall have any personal liability with respect to the liabilities or obligations of the Company, except to the extent that such Member expressly and voluntarily assumes in writing any obligations of the Company; and

(b)     No Member shall be personally liable or obligated, except as otherwise required by the Act, to return to the Company or to pay any creditor or

any other Member the amount of any return of its Capital Contribution to it or other distribution made to it.

6.2    Intentionally Omitted.

6.3    Company Meetings.

(a)    Meetings of the Company may be called by a Member holding at least twenty (20%) of the aggregate Percentage Interests in the Company upon no less than one (1) day but no more than twenty (20) days notice in writing to the other Members.

(b)    Members may participate in meetings by means of conference telephone calls in which all Members participating in the meeting can hear each other. Any vote may be cast in person, by telephone or by proxy. Proxies shall be valid only if in writing.

(c)    Any Member who fails to respond to any notice of meeting within twenty (20) days after hand delivery or the mailing thereof by certified or registered mail shall be deemed not to have consented to or approved any action proposed.

At any Company meeting, the presence in person or by telephone or proxy of Members representing at least a majority of the aggregate Percentage Interests in the Company shall constitute a quorum. Except as otherwise provided herein, the business of the Company presented at any meeting shall be decided by the vote of at least a majority of the Percentage Interests present at the meeting in favor of the action proposed.

6.4    Approval of Certain Matters.

Neither the Company nor any Member shall take any of the following actions without the approval of all Members:

(a)    Knowingly do any act in contravention of this Agreement;

(b)    Knowingly perform any act that would subject any Member to personal liability in any jurisdiction;

(c)    Admit any new Members to the Company; or

(d)    Require any additional capital contributions to the Company.

6.5    Covenant Not to Withdraw or Resign.

Each Member expressly agrees not to withdraw or resign from the Company prior to the dissolution and winding up of the Company.

### 6.6 Additional Members.

Additional Members may be admitted to the Company upon receiving the consent of the existing Members as set forth in Section 6.4. The terms of admission may provide for the creation of different classes or groups of Members, and/or Members having different rights, powers, and duties.

### ARTICLE 7

### ACCOUNTING

### 7.1 Books and Records.

The Members shall keep, or cause to be kept, true, exact and complete books of account of the Company's affairs, in which shall be entered fully and accurately each transaction of the Company and of each entity which it controls. The books of account shall be kept on a basis as determined by the Members. Such books of account, together with all correspondence, papers and other documents, shall be kept at the principal office of the Company and shall be, at all reasonable times, open to the examination of any of the Members or their duly authorized representatives. Except as otherwise provided herein, all financial books and records of the Company and of each entity which it controls shall be kept, and all financial statements furnished to the Members hereunder shall be prepared, in accordance with generally accepted accounting principles consistently applied as modified by tax basis accounting or such other basis as the Members may determine.

### 7.2 Fiscal Year.

The fiscal year and the taxable year of the Company shall end as of December 31 of each year.

### 7.3 Tax and Financial Reports.

(a) Not later than April 1 after the end of each fiscal year, each Member shall be provided with an information letter with respect to its distributive share of income, gain, deduction, losses and credits, as the case may be, for income tax reporting purposes for the previous fiscal year, together with any other information concerning the Company necessary for the preparation of a Member's income tax return, including Form K-1 from the Company.

(b) The Members shall prepare or cause to be prepared all Federal, state and local tax returns of the Company for each year for which such returns are required to be filed. The "tax matters partner" designated in Section 7.5 shall promptly notify all other Members of any Company audits by the US Internal Revenue Service or any state or local taxing authority.

(c)     The Members shall cause to be distributed to the Members, not later than April 1 after the end of each fiscal year, a balance sheet, and income statement prepared for the prior calendar year in accordance with generally accepted accounting principles consistently applied.

### 7.4     Company's Accounting Firm.

The Company's accounting firm shall be such firm of independent certified public accountants as the Managing Member may select from time to time.

### 7.5     Tax Matters Partner.

To the extent necessary under the Code, Robert Gladstone is hereby designated as the "tax matters partner" in accordance with Section 6231(a)(7) of the Code and, in connection therewith and in addition to all other powers given thereunder, shall have all other powers needed to perform fully hereunder, including, without limitation, the power to retain all attorneys and accountants of his choice. The tax matters partner shall give notice to each other Member of a Company audit. The designation made in this Section 7.5 is hereby expressly consented to by each Member as an express condition to becoming a Member.

## ARTICLE 8

## TERM AND DISSOLUTION

### 8.1     Term.

The term of the Company shall commence as of the date of this Agreement and shall continue until termination pursuant to the provisions hereof.

### 8.2     Events Causing Termination.

Except as otherwise provided herein, the Company shall be dissolved and shall terminate, and its affairs shall be wound up, upon the occurrence of any of the following:

(a)     the Bankruptcy of the Company;

(b)     the written consent of the Members;

(c)     the sale or other disposition of all or substantially all of the assets of the Company;

(d)     the death, retirement, insanity, resignation, withdrawal, expulsion, Bankruptcy, dissolution of a Member, or occurrence of any other event which terminates the continued membership of a Member in the Company under the Act, unless the business of the Company is continued by the consent of all the remaining Members.

### 8.3    Actions of Members.

No action of or event affecting a Member shall dissolve or terminate the Company unless specifically provided in Section 8.2 of this Agreement.

### 8.4    Distribution in Case of Termination.

Upon the termination of the Company, the Managing Member, or such liquidating agent as such Members may appoint, shall proceed to wind up the affairs of the Company, unless within ninety (90) days after such event all of the remaining Members agree in writing to continue the Company, in the following order of priority:

> (a)    To the payment of the debts and liabilities of the Company and the expenses of liquidation in the order of priority as provided by the Act, and to the establishment of any reserves which the Members or liquidating agent shall deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. Said reserves may be paid over by the Members or liquidating agent to a bank or an attorney-at-law to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations, and at the expiration of such period as the Members or liquidating agent shall deem advisable, such reserves shall be distributed to the Members or their assigns in the order of priority provided in this Section 8.4;

> (b)    To the Members in proportion to the credit balance in each of their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.

Liquidation shall be conducted in accordance with the timing requirements of Section 1.704-1(b)(2) of the Treasury Regulations. No Member shall be liable to restore, or pay to the Company, any deficit in such Member's Capital Account. The Company shall terminate when all property owned by Company shall have been disposed of and the net proceeds, after satisfaction of liabilities to creditors, shall have been distributed among the Members as aforesaid. The establishment of any reserves in accordance with the provisions of subsection 8.4((a)) shall not have the effect of extending the term of the Company.

### 8.5    Rights of Members on Liquidation.

Except as otherwise provided in this Agreement, (i) each Member shall look solely to the assets of the Company for the return of its Capital Contributions and shall have no right or power to demand or receive property other than cash from the Company and (ii) no Member shall have priority over any other Member as to the return of its Capital Contributions, distributions or allocations.

## ARTICLE 9

## TRANSFER OF COMPANY INTERESTS

9.1 Transfer of Interests Generally.

(a) All transfers of Company Interests (which for the purposes of this Article 9, shall also include any other securities convertible into or exercisable or exchangeable for Company Interests) shall be governed by and subject to the terms of this Article 9. A transfer shall include a voluntary or involuntary sale, exchange, assignment, gift, pledge, hypothecation, or other encumbrance or disposition (collectively, a "Transfer"). The Company shall not be required to transfer on its records any Company interest that has been purported to have been sold or transferred in violation of this Agreement, or to treat such purported owner, holder, or assignee as a Member or as having any economic rights in the Company. Each Member hereby acknowledges the reasonableness of the restrictions on the transfer of the interests in the Company imposed by this Agreement in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable.

(b) As a condition precedent to any Transfer of a Company Interest, the transferring Member shall cause the transferee(s) to execute and deliver to the Company a joinder to this Agreement, whereupon such transferee(s) shall be included in the definition of Member under this Agreement.

(c) The Members hereby agree that any and all sales of Company Interests permitted under this Agreement shall be for cash only.

(d) Notwithstanding anything to the contrary, Transfers of Company Interests for tax and estate planning purposes among family members or trusts solely for the benefit of family members, family limited partnerships or other entities solely for the benefit of such persons shall be free from the restrictions set forth in Section 9.2. A family member shall be a spouse or child of a Member and, for Robert Gladstone, Lucille Gladstone.

### 9.2 Restrictions on Transfer.

No Member may transfer his interest, in whole or in part, without the prior written consent of all Members, which may be unreasonably withheld.

### 9.3 Intentionally Omitted.

### 9.4 Indemnity.

If a Member shall, or shall attempt to, Transfer his or her Company Interest in violation of this Agreement, such Member shall indemnify and hold harmless the other Members and the Company against and from any and all liabilities, obligations, costs and expenses the other Members or the Company may incur as a result of such failure.

## ARTICLE 10

## GENERAL PROVISIONS

### 10.1 Binding Effect and Benefit of This Agreement.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, as the case may be.

### 10.2 Agreement, etc.

The titles of the Articles and Sections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions hereof. At the expense of the Company, the Members shall promptly have prepared, executed and filed or recorded all legally required fictitious name or other applications, registrations, publications, certificates and affidavits for filing with the proper governmental authorities and have arranged for the proper advertisement, publication and filing of record thereof.

### 10.3 Notices, etc.

Except as otherwise expressly provided herein, all notices which are required or contemplated by this Agreement shall be in writing. Delivery of such notices shall be deemed to be made when the same are either personally served upon the person entitled thereto or sent by telecopy (fax) to such person (with receipt acknowledged by the person receiving such telecopy) or three (3) days after being deposited in the mails, by certified or registered mail, with postage prepaid, addressed to such person at its mailing address as shown on the Company's records as changed by notice to parties hereto in accordance herewith.

10.4    Integration; Conflict with Members Agreement.

Except as set forth in the Members Agreement, this Agreement represents the entire understanding of the parties with respect to the subject matter hereof. In the event of any conflict between the terms and provisions of this Agreement and the Members Agreement, this Agreement shall control.

10.5    Interpretation.

This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware without regard to its conflicts of laws provisions. As used in this Agreement, the neuter, masculine and/or feminine gender shall include the neuter, masculine or feminine gender as required by the context of the sentence and the plural shall include the singular wherever appropriate.

10.6    Counterparts.

The parties hereto may execute this Agreement in any number of counterparts, each of which, when executed and delivered, shall be an original; but all such counterparts shall constitute one and the same instrument.

10.7    Severability of Provisions.

Each provision of this Agreement shall be considered severable. If for any reason any provision or provisions hereof are determined to be illegal or invalid, such illegality or invalidity shall not impair the operation of or affect those portions of this Agreement that are valid and this Agreement shall be construed in all respects as if such invalid or illegal provision was omitted.

10.8    Amendments, Termination and Waiver.

This Agreement may be amended, terminated or waived (whether retroactively or prospectively, and whether in a particular instance or generally) by the unanimous vote of the Members.

IN WITNESS WHEREOF, the parties have caused this Limited Liability Company Agreement to be executed as of the day and year first above written.

WITNESS:                                                MEMBERS:

                                4/18/02         _____
                                                Robert Gladstone

WITNESS:

                                4/18/02         _____
                                                John C. Lesher

## SCHEDULE A

_____ __, 200_

| Members | Percentage Interest | Capital Contribution |
|---------|---------------------|----------------------|
| Robert Gladstone | 80% | $760,000 |
| John C. Lesher | 20% | $190,000 |