UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re:                                      Chapter 11

Madison 92nd Street Associates LLC          Case No. 11- 13917 (SMB)

                              Debtor.
-------------------------------------------------------x

## DEBTOR'S OPPOSITION TO MOTION FOR DISMISSAL, APPOINTMNET OF A CHAPTER 11 TRUSTEE OR EXAMINER

### TO THE HONORABLE STUART M. BERNSTEIN, UNITED STATES BANKRUPTCY JUDGE:

Madison 92nd Street Associates LLC (the "Debtor"), by its attorneys, Goldberg Weprin Finkel Goldstein LLP, as and for its opposition to the motion of Robert Gladstone, Lucille Gladstone, John Lesher, and Andrew Harris, seeking dismissal of the bankruptcy case, or, in the alternative, the appointment of a chapter 11 trustee or examiner, respectfully represents and shows this Court as follows:

### OVERVIEW

1.      Stripped of its rhetoric, ad hominem arguments, and misplaced string citations to general principles of law that are factually inapposite, the motion of Robert Gladstone, his mother, Lucille Gladstone, John Lesher, and Andrew Harris, who actually hold a total membership interest of 46.745% (hereinafter, the "Minority") is another ill-motivated attempt[1] to

---

[1] Prior to bankruptcy, Robert Gladstone and John Lesher commenced suit in the Delaware Chancery Court alleging many of the same flawed contentions raised here, namely that there was a prior agreement among the members of the Debtor to sell the Hotel and that the failure of the majority members to authorize a sale constituted a breach of fiduciary obligation. These arguments failed to gain any traction in the Delaware Chancery Court during a preliminary hearing on July 18, 2011, at which time, Vice-Chancellor Laster appeared skeptical regarding any

upset an evolving business strategy that can truly preserve the long-term value of the Debtor's Marriott Courtyard hotel (the "Hotel"), instead of subjecting it to a foreclosure scenario in which the only beneficiary will be the Debtor's mortgagee, General Electric Capital Corp ("GECC").

2.     As will be established herein, this is a necessary and proper Chapter 11 filing and the Debtor has certainly not been hijacked by a group of wayward members under a hostile takeover.  Instead, after a number of dubious decisions that exposed the Debtor to a premature foreclosure sale, the Debtor is now being directed by majority members, 92nd St. Hotel Associates, LLC ("92nd Associates") and JKNY, LLC ("JKNY"), holding a combined 53.255% equity stake in the Debtor (the "Majority").

3.     The Majority members are well-intentioned, have the requisite authority under the Debtor's operating agreement ("Operating Agreement") and amendments thereto to act on behalf of the Debtor and have no allegiance to the failed strategies of the past.   Most importantly, the Majority have the financial wherewithal, relationships and experience to avoid an immediate sale of the Hotel.  The Majority has resisted a sale given the belief that this is simply an inopportune time because net operating income has been diminished due to the ill effects of the Debtor's association with Marriott.   Instead, the Majority are proceeding to obtain mortgage

---

actual evidence of an agreement and noted that the refusal to consent to a sale does not constitute a breach of fiduciary duty. Vice-Chancellor Laster also questioned the Minority's efforts to even file litigation in Delaware in light of the Sixth Amendment which conferred jurisdiction on the New York courts to resolve all membership disputes.  More will be said about the Delaware proceedings infra, but as a preliminary matter, it is certainly noteworthy that the Minority did not receive any interim relief, and in fact withdrew from the Delaware Court's calendar a possible evidentiary hearing previously rescheduled from August 22, 2011.   The fact that the Minority elected not to proceed in Delaware, knowing that a bankruptcy was looming in light of a scheduled foreclosure sale on August 24, 2011, reinforces the dubious nature of their contentions.  A copy of the July 18, 2011 hearing transcript before Vice-Chancellor Laster and the Court's letter confirming removal of the matter are annexed hereto as Exhibit "A" and "B" respectively.

refinancing, which they believe will enable the Debtor to address issues with GECC, while fending off a distressed sale and allowing the Hotel to stabilize and improve its net operating income.

4. Bankruptcy is synonymous with transparency and the Majority's pursuit of refinancing will be made known to everyone as it develops. Indeed, notwithstanding the Minority's bluster, the Majority are more capable of leading an effective reorganization than a third-party outsider. Currently, the Majority is working in conjunction with a large private equity fund, Westport Capital Partners LLC ("Westport"), and Savills LLC ("Savills"), to bring in a new mortgage lender. The goal is to replace GECC in fairly short order. Moreover, the Majority is prepared to infuse significant new capital as necessary, to reach agreement with GECC. At this point, the Majority only seeks a reasonable opportunity to achieve their intended goal of refinancing so as to preserve the Hotel for the partnership and other creditors, and bringing it back to its value of $109 million, which it appraised for as of December 1, 2009.[2]

5. Because the Chapter 11 petition was filed by a majority of the members, holding 53.255% of the equity, there is no actual 50%-50% deadlock that warrants the appointment of an operating trustee, examiner, or dismissal of the Chapter 11 case and the motion should be denied in all respects.

6. Indeed, the entire legal underpinnings of the motion is premised on a misleading reading of the amendments to the Operating Agreement, creating the false contention that the Minority have greater voting rights and power than they actually do. The Minority is just

---

[2] Relevant parts of the last available appraisal are annexed hereto as <u>Exhibit</u> "C". While the value of the Hotel is not necessarily directly at issue, it is certainly worth highlighting the fact that there was a significant equity in the Hotel. There is no reason to believe this equity cannot return as market conditions improve, particularly if the Debtor is able to utilize Chapter 11 to rid itself of a burdensome relationship with Marriott.

that — a minority of less than 50% which alone cannot dictate any corporate action. Under the Fifth Amendment, "all actions, contracts, documents and agreement" of the Debtor, except for a sale of the Hotel, require a simple majority vote of 51% of the members.

7.    For purpose of the Operating Agreement, the term "action" is used expansively and contains no limitations or qualifications relating to changes of co-managers. Accordingly, the term "action" should properly include the replacement of a co-manager. Contrary to the motion, there is nothing whatsoever in any of the amendments to the Operating Agreement, which expressly imposes an unanimity requirement regarding a change in co-managers or, states that an "action" does not include a change in co-managers.

8.    Equally important, although Robert Gladstone and 92 Associates became co-managers under the Fifth Amendment in 2004, there is nothing in that particular amendment or any subsequent amendments for that matter, which states that a future change in co-managers can only be effectuated under or by virtue of a formal amendment to the Operating Agreement. Likewise, Delaware does not require that a change in co-managers must be done through an amendment process, and the Minority has cited no statute or decision to this effect. Because the Operating Agreement does not contain an express statement that requires a change in co-manager to be done via amendment, there was no impediment to prevent a 51% majority of the members to act to change co-managers through a resolution of the Company following a properly noticed meeting.

9.    The Minority reads for too much into a general miscellaneous provision which requires actual amendments to be signed by all members where, as here, the Operating Agreement is otherwise clear as to what types of matters and decisions require an amendment.

10. Finally, there is nothing in JKNY's admission agreement that indicates JKNY is deprived of all voting rights for all purposes such that JKNY could not vote at the special meeting on August 16, 2011. The sudden notion that JKNY's membership interest dating back to 2002 is somehow a revocable gift held at the whim of Robert Gladstone is nothing short of sophistry and ignores Mr. Kosow's notable contributions to the development of the Hotel over a period of several years.

11. In short, the Majority acted in furtherance of the 51% voting rules governing the Debtor, which conferred upon them the requisite authority to vote to replace Robert Gladstone as a Co-Manager and to file the instant Chapter 11 petition.

12. In essence, the motion boils down to a calculus of whether the 53.255% vote of Majority is controlling based upon a careful analysis of JKNY's rights. Given the overriding importance of this threshold "authority issue", we will focus upon it immediately after a review of the Debtor's business and capital structure. This background information will better assist the Court in understanding the current divide in approach between the Majority and the Minority regarding pursuit of a refinancing to stabilize the situation or acquiescence to a sale at a low ebb in the Hotel's history.

## **BACKGROUND FACTS**

13. The Debtor is a Delaware limited liability company which owns a commercial condominium located at 410 East 92nd Street, New York, NY, improved by the Hotel with 226 rooms and known as "Upper East Side Courtyard by Marriott".

14. In 2003, 92 Associates was admitted as a 50% member and co-manager based upon a total capital contribution of $5.5 million. The original members of the Debtor, Robert

5

Gladstone and John Lesher, contributed far less in capital and 92 Associates came into the company as the financial partner to assist in the actual construction of the Hotel.

15.     JKNY was involved from the beginning, and was initially admitted as a 5% member in October, 2002.  Thereafter, JKNY's 5% percentage was restructured and became a 2.255% interest in 2006 with the admission of 92 Associates and Lucille Gladstone.  In 2008, JKNY's percentage increased to 3.255% under the Eight Amendment which remains in place today.

16.     Following construction, the Hotel opened in 2006 under the Marriott flag pursuant to a management agreement with Courtyard Management Corporation ("Courtyard").  Courtyard is a subsidiary of Marriot International, Inc. ("Marriot").

17.     The Debtor's relationship with Marriott has imposed terrible burdens on the Hotel's operations and profitability and undermined the Hotel's overall value due to excessive operating costs and mismanagement.

18.     In 2009, the Debtor instituted a formal suit against Courtyard in the Supreme Court, New York County (Index No. 602762/2009), asserting, inter alia, claims for breach of contract, fraud and misrepresentation, and breach of fiduciary duty even while Courtyard continues to manage the Hotel on a day-to-day basis.

19.     As stated in the Local Rule Affidavit, the Debtor's claims against Courtyard center around the core contentions that beginning approximately three years ago, Courtyard and Marriott saddled the Hotel with unreasonably high operating expenses, attributable, in large measure, to an utterly unworkable labor deal reached with the New York Hotel and Motel Trades Council, AFL-CIO.  While the Debtor is not a subject to a direct collective bargaining agreement,

Courtyard hired unionized workers and thereby effectively obligated the Debtor to absorb and pay the costs of stringent union work rules and seniority requirements, as well as high compensation rates and overtime. Under the management agreement, Courtyard is the actual employer of all Hotel workers (although it funds the costs of payroll and benefits from the Hotel's operating revenues).

20.     As a result, the Debtor has been burdened with far more onerous labor costs than other New York City Marriott locations that are company affiliated, which do not utilize union employees, placing the Debtor at a competitive disadvantage by elevating operating expenses. The fact that the Debtor is not the actual employer means that rejection of the management agreement will rid the Debtor of a unionized workforce without needing to invoke the provisions of 11 U.S.C. §1113.

21.     Additionally, the high costs of labor have contributed to an erosion in net operating income by approximately 50% during the last three years. The erosion in net operating income, of course, negatively impacted the value of the Hotel. While some of the decline is due to market conditions and a slow down in the economy; the fact remains that Courtyard has increased operating expenses at the Hotel by more than $2 million annually post-unionization.

22.     Additionally, Marriott and Courtyard exacerbated cash flow difficulties by booking a disproportionately high number of rewards customers at the Hotel at reduced rates, which do not even cover basic operating expenses. While this practice is beneficial to the overall business of Marriott and Courtyard in New York, it has exacted a steep price on the Debtor's cash flow.

23.     As a direct result of years of mismanagement, the Debtor became delinquent with its mortgage obligations owed to GECC, and found itself subject to foreclosure

proceedings. GECC obtained a judgment of foreclosure in July, 2011 and quickly scheduled a foreclosure sale for August 24, 2011, which was stayed by the Chapter 11 filing on August 16, 2011.

## THE CURRENT ALIGNMENT OF THE MEMBERSHIP

24.     As noted above, the Majority consists of 92 Associates and JKNY. 92 Associates itself is a limited liability company beneficially owned and operated by Mr. Louis Taic and Mr. Michael L. Fischer. Messrs. Taic and Fischer are long-time business partners, who have interests in a number of hotel properties and residential apartment buildings. The business profile for Mr. Taic is annexed hereto as Exhibit "D" and highlights his many years of experience in the real estate and hotel business. There is no dispute that 92 Associates is a 50% member and a co-managing member.

25.     In fact, 92 Associates is the only 50% member. The Minority currently consists of Robert Gladstone, who is a principal of Madison Equities, his mother, Lucille (a 5% member), Mr. Gladstone's long-time partner John Lesher (a 8.569% member), and Andrew Harris who owns 1%. With the 92 Associates and the Gladstone group at odds, JKNY has emerged as a key member to break any impasse.

## JKNY RETAINS INDEPENDENT VOTING RIGHTS

26.     JKNY is singularly owned and controlled by Mr. Jeffrey Kosow. Mr. Kosow is a very able real estate professional in his own right, who was associated with Robert Gladstone and Madison Equities for approximately ten (10) years time before leaving in January of 2010.

8

27.     Mr. Kosow had over thirty (30) years of experience before coming to Madison Equities in 2000 and he is well-versed in the financing, managing and developing large real estate projects. A copy of Mr. Kosow's business profile is annexed hereto as Exhibit "E", together with various letters from lenders involved with the Hotel lauding his services; including a letter of recommendation from Robert Gladstone himself following Mr. Kosow's departure in early 2010. In his letter, Mr. Gladstone characterized Mr. Kosow as "a seasoned professional with a strong work ethic and extensive real estate and financing experience" who "worked as a valued member of the Madison team". These letters, which also include a letter from Olshan Grundman Frome Rosenzweig & Wolosky LLP, should dispel the misguided notion that Mr. Kosow was purportedly "terminated for cause" by Robert Gladstone (Motion, ¶ 21).

28.     During his years with Madison Equities (Robert Gladstone's company), Mr. Kosow served as an independent contractor and consultant on a number of projects, receiving consulting fees and equity interests in various projects. Mr. Kosow's involvement with the Debtor was typical of his regular arrangement with Mr. Gladstone—he was admitted as a member pursuant to an admission agreement dated October 25, 2002 (the "Admission Agreement") based upon his significant contributions to the project. In fact, Mr. Kosow, who is a Wharton graduate, was instrumental in not only arranging and closing the acquisition financing, but was involved in multiple refinancings and oversaw with counsel a favorable final settlement of the construction contract with the project's general contractor, Pavarini McGovern. In consideration for his myriad of services, Mr. Kosow's company, JKNY, received a membership interest in the Debtor, which it has held continuously since 2002, although the specific percentage changed over time as new members came on board.

29.     The terms of JKNY's admission agreement have been mischaracterized by the Minority in an effort to invalidate JKNY's vote in favor of filing a Chapter 11 petition and voting to replace Mr. Gladstone as co-manager. Although aligned with Robert Gladstone for many years, JKNY nevertheless retained the right to exercise independent judgment concerning voting on various Company matters subject to certain well-defined exceptions.

30.     To this effect, Section 1 of the Admission Agreement provides in relevant part that JKNY waives its right of approval solely regarding Section 6.4, 8.2 (b) and (d), and 9.2 of the Operating Agreement, none of which are implicated here.[3] See Exhibit "F" annexed hereto for the Court's ready reference.

31.     As to all other matters however, there is no restriction as to how JKNY may vote. Indeed, there is no provision in the Admission Agreement that JKNY is designated as a non-voting member or automatically part of the Gladstone voting block by proxy or otherwise.

32.     Moreover, even if JKNY singularly cannot make a decision, this is not to say that JKNY cannot vote on a particular decision so long as it is not covered by Section 6.8, 8.2 (b) and (d), or 9.2. Any other reading of the Admission Agreement is flawed for a number of reasons.

33.     First, if JKNY was truly not allowed to vote at all, there is certainly a much clearer way expressing such an intent (i.e., "JKNY shall have no voting rights whatsoever"). Secondly, if JKNY was not permitted to vote, there would be no need to include the waiver of approval regarding Section 6.4, 8.2 (b) and (d), and 9.2 of the Operating Agreement. Thirdly, over the years, JKNY has in fact voted on various other matters, including multiple decisions to proceed

---

[3] Section 6.4 states that JKNY cannot vote on an act which contravenes the Operating Agreement or subjects any member to personal liability. Additionally, JKNY cannot vote to admit new members or require additional capital.

with various refinancings. Fourthly, if JKNY was not intended to have any voting rights, there would be no logical reason for the members to subsequently provide that a sale of the Hotel required the unanimous consent of all members holding a 5% interest or more as contained in the Eight Amendment. Obviously by inserting this provision, the members recognized that JKNY would be able to vote on a sale absent the establishment of a 5% threshold.

34. Finally, and most significantly, to the extent any possible doubt may exist regarding JKNY's voting rights it is answered by a separate agreement made between Robert Gladstone and Jeffrey Kosow made on November 28, 2006. Under this agreement, Mr. Gladstone recognized that Mr. Kosow not only owned his regular 2.255% membership interest in the Debtor but also an additional "1% beneficial interest" by virtue of Robert Gladstone's direct membership interest. The parties called this additional 1% beneficial interest an "Indirect Interest" and importantly made a distinction in voting rights between this Indirect Interest and JKNY's 2.255% regular membership interest.

35. Under the letter agreement quoted above, JKNY could not vote the Indirect Interest, without otherwise "restricting" JKNY's right to vote its 2.255% Interest. Thus, it was clearly understood that JKNY could independently vote its 2.225% percentage which subsequently became a 3.255% in 2008. The November 28, 2006 agreement was prepared by Mr. Gladstone's counsel, Olshan Grundman Frome Rosenzweig & Wolosky LLP, so the firm is well aware of the full extent of JKNY's overall voting rights but neglected to mention the agreement in its submission.

36. A copy of the November 28, 2006 Letter Agreement is annexed hereto as Exhibit "G" and provides in relevant part as follows:

11

1.     In addition to JKNY's existing 2.255% interest in the Company ("2.255% Interest"), JKNY has also owned, from the Company's inception, a 1% beneficial interest ("Indirect Interest") in the Company by virtue of my direct membership interest in the Company. You acknowledge that JKNY has not contributed any capital and that any distributions by the Company, which are a return of capital, shall be paid to me. You further acknowledge that JKNY's beneficial interest in the Company is a so-called "profits interest" within the meaning of the tax laws.

2.     With respect to your Indirect Interest, JKNY will not be a member in the Company nor will you have any ability to vote the Indirect Interest or use the Indirect Interest to consent to any Company action including without limitation any amendment to the Company's LLC Agreement or the admission of new members into the Company. This restriction shall not effect JKNY's 2.255% Interest. (emphasis supplied).

37.     Lastly, one other observation is worth noting about the Admission Agreement—it related to JKNY's initial percentage ownership and does not include the additional 1% interest that JKNY subsequently received in 2008, years after JKNY's admission into the Company. Thus, even if the Admission Agreement somehow controls JKNY's initial membership, it does not control the subsequent 1% which JKNY acquired and gives the Majority the necessary 51% override under any circumstances.

## BASIS FOR MAJORITY'S DECISION NOT TO APPROVE THE PRIOR SALE PROPOSAL

38.     The Majority's reasons and rationale for not approving the prior sale proposal needs to be understood since the issue has caused a great deal of angst.

39.     From 2007 to 2010, the Hotel experienced a drop in net operating income ("NOI") of approximately $4.0 million (50%) because of the recession and Courtyard's introduction of a unionized workforce and mishandling of other operating issues.

40. As a result of the decline in NOI resulting from the suffocating effects of the Marriott/Courtyard relationship, the Hotel became susceptible to opportunists looking to prey on the Debtor's vulnerability, particularly in the face of a pending foreclosure action.

41. In reality, the prior sale proposal only contemplated a cash payment of $80 million (not enough to pay the mortgage and all associated taxes), plus a speculative $6 million earn-out that would likely never be realized. Additionally, the proposed purchaser retraded the terms of the deal downward several times, reducing the purchase price by $10 million, and presented a proposed contract that was designed to minimize any real opportunity for the earn-out. The Majority soured on the process and came to realize that a sale at this time would be a terrible mistake. Indeed, considering that the Hotel was appraised for $109 million within the last few years, it simply became too bitter a pill to swallow to approve a sale that would result in a loss of approximately $30 million in value.

42. On the other hand, the prospect of refinancing the mortgage in combination with a rejection of the Marriott/Courtyard management agreement presented a far better alternative than forfeiting years of hard work to build and develop the Hotel. It is only common sense that an asset should not be sold at its low point if there are other alternatives.

43. If the Minority no longer has the stomach or resources for a comeback, this should not prevent the Majority from making an earnest attempt to do so. The chapter 11 filing offers a multitude of opportunities, including the renewed ability to negotiate with GECC on a more even playing field and the ability to reject the Marriott contract as burdensome under 11 U.S.C. § 365.

13

44.     Indeed once the Marriott situation is rectified, the NOI will increase significantly and additional value can be easily achieved. Accordingly, patience should rule the day, instead of desperation.

### THE DIVIDE BETWEEN THE MAJORITY AND MINORITY LEADING TO COMMENCEMENT OF LEGAL PROCEEDINGS IN DELAWARE AND THEN CHAPTER 11 IN NEW YORK

45.     With pressure mounting as a result of the foreclosure action, the Debtor, primarily through Robert Gladstone, actively sought a buyer for the Hotel. The Majority cooperated in this endeavor and reviewed offers to buy the Hotel. The purchase price, however, became a moving target and was retraded in connection with the imposition of other unfavorable terms by the proposed buyer. In the end, the Majority declined to approve the sale as more fully explained above.

46.     As an alternative, the Majority urged the Minority to consider a refinancing option and engaged Westport as a possible source. The Majority signed a term sheet with Westport on July 21, 2011, a copy of which is annexed hereto as Exhibit "H". Thereafter, the Majority and Westport have consulted with a leading mortgage broker, Savills, to assist in procuring a replacement first mortgage lender. Savills has already received favorable initial responses from several institutions as outlined in a status report which will be filed before the hearing as Exhibit "I". Thus, the Majority's efforts to obtain refinancing are well under way.

47.     In the meanwhile, the Minority commenced suit pre-petition in Delaware, alleging in substance that 92 Associates allegedly reneged on a purported agreement to sell the Hotel and thereby violated its fiduciary obligations. The Minority relied upon a statement from Louis Taic, on June 15, 2011, who emailed the following message: "Please email a final [contract]

14

so I can read before [          ]". After reading the contract, Mr. Taic declined to execute it and the lawsuit ensued. During the Minority's request for an expedited hearing, the Court found the Minority's contention of an actual consent "skimpy" and inadequate to justify any type of stay or injunctive relief. In pertinent part, Vice-Chancellor Laster ruled:

> I think that the critical issue here is whether [92 Associates], in fact, has consented as a factual matter to this amendment. I think they can withhold that 50-percent-level consent at their discretion and that they have the right to do so in their self-interest. I think that the allegations of the complaint are simply, and that it is only by reading the allegations of the complaint in the most-plaintiff-friendly manner possible that one could plausibly infer or colorably infer that factual consent is given.

> But I do agree with Mr. Wright that, if I do not schedule this today, then, effectively, it will end the case because of the timing. And as a result, I am going to err on the side of scheduling this. But I will tell you right now that I am deeply skeptical of the idea that consent was given absent a factual showing that goes meaningfully beyond what is here. In other words, while the plaintiff has shown enough to schedule a hearing, this would not be enough for reasonable probability of success on the merits as to the 50 percent consent being given.

Exhibit "A" (Tr. pgs 32–33).

48.    Following Vice-Chancellor's ruling, the Minority's case in Delaware lost all of its steam. No discovery was sought and the Minority voluntarily took the matter off the Court' August 22, 2011 calendar. Instead, the Chancery Court is monitoring the proceedings in light of the subsequent Chapter 11 filing and a status report was recently filed detailing the proceedings here.

49.    It is also noteworthy that the Minority did not utilize the pending Delaware action as a forum to challenge the authority of the members to file Chapter 11 petition or replace Robert Gladstone as co-manager.

15

50.     The opportunity was presented to the Minority since they received prior notice of the meeting on August 15, 2011, a copy of which is annexed hereto as Exhibit "J".

51.     The meeting occurred as scheduled on August 16, 2011, and the resolution attached hereto as Exhibit "K" was signed authorizing the Chapter 11 filing by JKNY and 92 Associates.  Since the commencement of the bankruptcy proceedings, the Debtor has been actively engaged in negotiating a cash collateral stipulation with GECC and Marriott.

## BECAUSE THE MAJORITY ACTED WITH REQUISITE 51% AUTHORITY, THERE IS NO BASIS TO DISMISS THE CHAPTER 11 CASE

52.     The immediate answer to the motion is that none of the relief sought is appropriate unless the Majority lacked authority to commence bankruptcy proceedings based upon a 51% vote.  The Minority's arguments are unavailing and the motion should be denied.

53.     Naturally, the starting point when analyzing whether a bankruptcy case should be dismiss is section 1112(b)(1) of the Bankruptcy Code which provides that ". . . on request of a party in interest, and after notice and a hearing . . . the court shall . . . dismiss a case under this chapter . . . if the movant establishes cause."

54.     On a motion to dismiss, the burden of proof rests squarely with the movant to establish by a preponderance of the evidence that dismissal is warranted.  See In re New Batt Rental Corp., 205 B.R. 104, 106–07 (Bankr. N.D. Ohio 1997); In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995).

55.     The Minority is correct in its assessment that the question of whether a business entity is authorized to commence a Chapter 11 case is a matter of the law of the entity's state of organization (Price v. Gurney, 324 U.S. 100 (1945)), and that here, the Debtor is governed by Delaware law.  In Delaware, a limited liability company is likewise governed by the terms of its

operating agreement. From here, however, the parties depart, as the Debtor takes great issue with the Minority's dual contentions that (i) a change in co-managers requires an amendment, as opposed to a vote of 51%, and (ii) JKNY lacked voting rights.

56.     As explained above, under the Fifth Amendment to the Operating Agreement, "any and all actions or decisions" of the Debtor require a majority vote of 51% of the members. This provision is simple, concise and starkly clear; and the Fifth Amendment does not qualify or limit the nature or scope of any actions or decisions. Thus, the term "any and all actions or decisions" necessarily includes not only commencement of legal proceedings, but also the replacement of a managing member. Accordingly, when the Majority, at a properly noticed special meeting,[4] adopted a resolution authorizing the replacement of Robert Gladstone as a co-manager of the Debtor and the filing of a Chapter 11 case, it did so following the strictures of the Operating Agreement and the Fifth Amendment.

57.     It is a stretch for the Minority to argue that, because both Robert Gladstone and 92 Associates initially became co-managers under the Fifth Amendment, all changes automatically required a formal amendment. Such an interpretation cannot properly arise by implication given the broad language of "any and all actions or decisions" require a 51% vote. Thus, the Minority's reading finds no traction under the specific voting terms of the Operating Agreement or amendments thereto. In view of the express 51% requirement, there can be no *de facto* unanimity requirement for replacement of co-managing member. Likewise, the claim that

_____

[4] The special meeting of the members of the Debtor was held on August 16, 2011. The meeting was called pursuant to paragraph 6.3 of the Operating Agreement ("Meetings of the Company may be called by a Member holding at least twenty (20%) of the aggregate Percentage Interests in the Company upon no less than one (1) day but no more than twenty (20) days notice in writing to the other Members") and held pursuant to notice dated August 15, 2011, which was hand-delivered to each member of the Minority on August 15, 2011.

JKNY cannot legitimately vote has been clearly undermined by the November 28, 2006 agreement and the other incongruities highlighted above.

58. Accordingly, dismissal in not warranted here as the filing of instant case was clearly authorized by members of the Debtor holding the required 51% equity interest in the Debtor.

## THE APPOINTMENT OF A TRUSTEE OR
## AN EXAMINER IS UNNECESSARY IN THIS CASE

59. Section 1004 of the Bankruptcy Code governs appointment of a trustee or examiner and provides various basis for such appointment including "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after the commencement of the case, or similar cause," (section 1004(a)(1)) and "interest of creditors, any equity security holders, and other interests of the estate" (section 1004(a)(2)). Alternatively, rather than appointing a trustee, a court may appoint an examiner under section 1004(c).

60. Generally, Courts consider the appointment of a trustee an extraordinary remedy as there is a "strong presumption that the debtor should be permitted to remain in possession and control of its business." In re 4 C Solutions, Inc., 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003); Petit v. New England Mort. Servs., Inc., 182 B.R. 64, 68 (D. Me. 1995) (describing an appointment of a trustee as an "'extraordinary' act") (quoting In re Ionosphere Clubs, Inc., 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990)); In re Deena Packaging Indus., Inc., 29 B.R. 705, 706 (Bankr. S.D.N.Y. 1983).

61. A true 50%-50% deadlock among the management or members of a limited liability company may in fact provide the requisite compelling justification to warrant the appointment of a trustee. However, the fact is that no such deadlock exists in this case. As noted

18

above, the Majority holds, at minimum, 51% equity interest in the Debtor, sufficient to permit it to undertake any and all necessary actions and decisions on behalf of the Debtor during the course of this Chapter 11 case.

62.     While the Minority cites multiple cases in support of its argument to appoint a trustee or examiner, none of the cases are particularly relevant. First, the bulk of the cases cited by the Minority dealt with a debtor that was a corporation plagued by an "effective" deadlock by a board of directors that was incapable of making decisions. See In re Advanced Electronics, Inc., 99 B.R. 249, 249 (Bankr. M.D. Pa. 1989) (finding that "it is clear that the Board of Directors in Advanced Electronics, Inc. is in effect deadlocked"); In re Petralex Stainless, Ltd., 78 B.R. 738, 744–45 (Bankr. E.D. Pa. 1987) (appointing a trustee where the "board [was] effectively deadlocked" and "unable to resolve financing problems"); In re Colorado-Ute Electric Assoc., Inc., 120 B.R. 164, 175 (Bankr. D. Colo. 1990) (finding that "the conflicts between and among [debtor] and the board of directors are formidable" and the "Court cannot envision management and the board functioning effectively and efficiently to reorganize" the debtor); In re Cajun Power Cooperative, Inc., 74 F.3d 599, 600 (5th Cir. 1996) (upholding lower court's appointment of a trustee upon finding that "the conflicts of interest within the members of the Board of [debtor]").

63.     By comparison, the Majority here has the necessary power to make decisions subject to Bankruptcy Court's overriding jurisdiction and the need to deal with creditor constituencies. Moreover, the Majority is not necessarily adverse to seeking to obtain a consensus with Minority or attempting to address all valid concerns in a way that promotes an effective reorganization.

19

64.    In the one case cited by the Minority actually dealing with a limited liability company debtor, In re Towne Development, LLC, 404 B.R. 140 (Bankr. M.D. La. 2009), there was an actual deadlock between the members of the debtor. In that case, the debtor's membership composed of three limited liability companies—Shearwater Communities, L.L.C. ("Shearwater") held a 50% interest, JRJ Development, L.L.C. ("JRJ") held 30%, and Welltown Investments, L.L.C. ("Welltown") held 20%. Shearwater had two members who were in a dispute over the ownership of that company. Since Shearwater owned a 50% equity stake and no decision could be made by the debtor without its approval, the court found that the "Shearwater membership dispute effectively . . . paralyzed [the debtor's] management" requiring appointment of a trustee. This is clearly not the case here, where 92 Associates and JKNY are fully aligned and there is no internal infighting which will defer or defeat an effective reorganization.

65.    In the final analysis, the appointment of an operating trustee comes at an extremely sensitive time and would be very detrimental to the ability of the Debtor to pursue refinancing. Almost by definition, an operating trustee pushes the Debtor toward a sale scenario even though the real potential of the Hotel cannot be immediately realized until rejection of the Marriott/Courtyard management agreement, which could also be unnecessarily complicated by the appointment of a Chapter 11 trustee. The flip-side to a rejection is the need to hire and retain a new management company which the Majority is better able to do given their long history in the hotel business.

66.    There is time enough to consider a further sale of the Hotel, but at least in the near term and during the initial exclusive period, the Debtor should be afforded a reasonable

opportunity to pursue a refinancing so as to give the estate at least a fighting chance to stabilize the Hotel and insure long-term value for all concerned.

WHEREFORE, for all the reasons advanced throughout, Minority's motion should be denied consistent with the foregoing, together with such other and further relief as is just and proper.

Dated: New York, New York
September 8, 2011

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
*Attorneys for Debtor*
1501 Broadway - 22nd Floor
New York, New York 10036
(212) 221-5700

By: _____
        Kevin J. Nash

TO:

Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn:   Greg Zipes, Esq.
(Greg.Zipes@usdoj.gov)

William M. Goldman, Esq.
DLA PIPER LLP (US)
*Attorneys for Marriott International, Inc.*
*and Courtyard Management Corporation*
1251 Avenue of the Americas
New York, New York 10020-1104
(thomas.califano@dlapiper.com)
(william.m.goldman@dlapiper.com)

Adam H. Friedman, Esq.
Fredrick J. Levy, Esq.
Olshan Grundman Frome Rosenzweig
      & Wolosky LLP
*Attorneys for Robert Gladstone, Lucille*
*Gladstone, John Lesher and Andrew Harris*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(afriedman@olshanlaw.com)
(flevy@olshanlaw.com)

King & Spalding LLP
*Counsel for General Electric Capital Corporation*
1185 Avenue of the Americas
New York, New York 10036
Attn:   Michael C. Rupe, Esq.
        Heath D. Rosenblat, Esq.
(mrupe@kslaw.com)
(hrosenblat@kslaw.com)

Stuart I. Gordon, Esq.
Rivkin Radler LLP
926 RXR Plaza
Uniondale, New York 11556-0926
(stuart.gordon@rivkin.com)

Ronald J. Rosenberg, Esq.
Rosenberg Calica & Birney LLP
100 Garden City Plaza, Suite 408
Garden City, New York 11530
(ron@rcblaw.com)

H:\Jessica\word\Madison 92nd Street Associates LLC - FISMI.30329\Bankruptcy\Opposition to Dismissal Mtn (9.8.11) (v.6).doc

22