UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
------------------------------------------------------------X  
In re:                                                    :  
                                                          :   Chapter 11  
MADISON 92ND STREET ASSOCIATES LLC,   :   Case No. 11-13917 (SMB)  
                                                          :  
                           Debtor.                  :  
------------------------------------------------------------X  

FOR PUBLICATION

# MEMORANDUM DECISION AND ORDER
# OVERRULING OBJECTION TO GECC CLAIM

**A P P E A R A N C E S:**

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP  
Special Counsel to Debtor  
1501 Broadway, 22nd Floor  
New York, New York 10036  

    Kevin J. Nash, Esq.  
        Of Counsel  

KING & SPALDING LLP  
Counsel to General Electric Capital Corporation  
1185 Avenue of the Americas  
New York, New York 10036  

    Michael C. Rupe, Esq.  
    Heath D. Rosenblat, Esq.  
        Of Counsel  

**STUART M. BERNSTEIN**  
**United States Bankruptcy Judge:**

      Prior to the petition date, General Electric Capital Corporation ("GECC"), the debtor's mortgagee, obtained a Consensual Judgment of Foreclosure and Sale ("Judgment") that, *inter alia*, entered judgment in favor of GECC against the debtor in the amount of $74,007,710.71. After this chapter 11 case was filed, GECC filed a proof of secured claim in the amount of the Judgment, and the debtor filed an *Objection to Various Aspects of the Secured Claim of General Electric Capital Corporation*, dated Apr. 3, 2012 ("*Objection*") (ECF Doc. # 218).

The *Objection* makes two arguments. First, the portion of the Judgment that includes a prepayment premium in the amount of $3.1 million should be disallowed. Second, the Court should fix the post-petition, pendency interest rate under § 506(b) of the Bankruptcy Code in the amount of the federal judgment rate, which is currently less than 0.2%, rather than the 9% rate provided for under New York's Civil Practice Law & Rules ("CPLR") § 5004. For the reasons that follow, the objection is overruled.

## BACKGROUND

The debtor owned real property located at 410 East 92nd Street in Manhattan which it operated as a hotel (the "Hotel"). In May 2008, the debtor borrowed $62 million from GECC, and secured its obligation by granting GECC a mortgage on the Hotel. Absent acceleration, prepayment or extension, the loan was due and payable on May 31, 2013. (Consolidated, Amended and Restated Promissory Note, dated May 12, 2008 (the "Note").)[1] The debtor was required to pay interest only for the first two years, and beginning on June 1, 2010, make monthly principal amortization payments based upon a 30 year amortization schedule. (Loan Agreement at § 2.3.)[2]

The debtor had the right to prepay the loan but only after the 36th loan month (the "Lockout Period"). (*Id.* at § 2.3(4).) The Loan Agreement imposed a prepayment premium that, according to the debtor, was "designed to take into account both lost interest, and the loss [*sic*] opportunity cost from the lender having tied up its money in this loan instead of investing it elsewhere." (*Debtor's Reply to GECC's Response and Opposition to the Pending Objection to*

---

[1]  A copy of the Note is attached to the *Objection* as Exhibit A.

[2]  A copy of the Loan Agreement is attached to the *Objection* as Exhibit C.

*Various Aspects of GECC's Secured Claim*, dated May 15, 2012 ("*Reply*"), at 8 (ECF Doc. # 277).) The prepayment premium was equal to the greater of 1% of the outstanding balance of the loan or the Make Whole Breakage Amount calculated as provided in Schedule 2.3(4) to the Loan Agreement. (Loan Agreement at § 2.3(4).) The Make Whole Breakage Amount involved a complicated formula based, among other things, on the U.S. Dollar Composite Swap Rate and the Weighted Average Life of the Loan, and was intended to estimate the present value of the future interest payments that would be eliminated by virtue of the prepayment. (*See* Loan Agreement, Schedule 2.3(4).)

A different rule, and the one applicable in this case, applied "[i]f the Loan is accelerated during the Lockout Period for any reason other than casualty or condemnation." (Loan Agreement § 2.3(4).) In that event, the Loan Agreement imposed a prepayment premium equal to 5% of the outstanding balance of the loan. (*Id.*) It is undisputed that the debtor defaulted and GECC accelerated the loan during the Lockout Period.

Finally, the loan bore interest at the annual rate of 6.94%, plus an additional 5% as liquidated damages in the event that the debtor failed to pay any installment of interest or principal within five days of the due date. (*Id.* at § 2.2.)

Following the debtor's default, GECC commenced a foreclosure action in New York supreme court ("State Court Action"), and ultimately obtained entry of the Judgment on May 26, 2011. As noted, the Judgment was consensual, and included the award of the 5% prepayment premium as one of its components. GECC thereafter noticed a foreclosure sale, but the sale was automatically stayed when the debtor filed this chapter 11 case.

GECC filed a proof of claim in the amount of the Judgment, and the debtor filed the *Objection* contending that the prepayment premium should be disallowed and the post-petition interest rate should be fixed at the federal judgment rate. In the meantime, the debtor sold the Hotel under a confirmed plan. GECC's lien attached to the proceeds of the sale, and its claim is oversecured.

## DISCUSSION

**A.    The Prepayment Premium**

The debtor's objection to the allowance of the prepayment premium, which is included as a component of the Judgment, is barred under the doctrine of *res judicata*. The Judgment is entitled to full faith and credit, 28 U.S.C. § 1738,[3] and the Judgment has the same preclusive effect in this Court as it would have in state court. *See Burka v. New York City Transit Auth.*, 32 F.3d 654, 657 (2d Cir. 1994). Under New York law, a consent judgment has the same *res judicata* effect as a judgment on the merits. *Levy v. United States*, 776 F. Supp. 831, 835 (S.D.N.Y. 1991); *Silverman v. Leucadia, Inc.*, 548 N.Y.S.2d 720, 721 (N.Y. App. Div. 1989); *see Canfield v. Elmer E. Harris & Co.*, 170 N.E. 121, 122 (N.Y. 1930). *Res judicata* bars successive litigation upon the same transaction or series of transactions if (1) there is a judgment

---

[3]    Section 1738 provides:

>    The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.
>
>    The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.
>
>    Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

on the merits rendered by a court of competent jurisdiction and (2) the party against whom *res judicata* is invoked was a party to the earlier action, *People v. Applied Card Sys., Inc.*, 894 N.E.2d 1, 12 (N.Y. 2008), and this mandate applies to bankruptcy courts. *Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987), *cert denied*, 484 U.S. 1007 (1988). Here, the New York supreme court had jurisdiction to render the Judgment, the Judgment included the 5% prepayment premium as part of the damage award and the debtor was a party to the State Court Action and expressly consented to the Judgment.

The *Objection* acknowledges the preclusive effect of the Judgment but contends that *res judicata* does not automatically foreclose the debtor from challenging the allowability of the claim under the Bankruptcy Code. The statement is overly broad and ultimately wrong in this case. A bankruptcy court may not look behind a state court judgment to decide claims or issues resolved in the prior action unless the judgment was procured by fraud or collusion, or the state court lacked jurisdiction. *See id.* None of these exceptions apply.

It is true that a bankruptcy court may also "look behind" a valid state court judgment to determine a bankruptcy issue that was never considered or decided in the earlier action. In those situations, however, *res judicata* and collateral estoppel still apply. For example, the bankruptcy court can determine whether a judgment based on fraud is dischargeable under 11 U.S.C. § 523(a)(2), but must apply the law of collateral estoppel in resolving the § 523 issues. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). Similarly, the bankruptcy court can look behind a state court judgment to determine whether the judgment creditor's allowable claim is capped under § 502(b)(6) of the Bankruptcy Code, but the components of the judgment cannot be re-litigated. *In re Tittle*, 346 B.R. 684, 689-90 (Bankr. E.D. Va. 2006).

5

Here, the debtor is not attempting to raise a "bankruptcy issue," but instead, argues that the prepayment premium is unenforceable under non-bankruptcy law. (*See Objection* at ¶¶ 36-38.) That argument should have been raised before the New York supreme court. Instead, the debtor consented to the inclusion of the prepayment premium as part of the Judgment, and the Judgment precludes the debtor from re-litigating that issue before this Court. *See Abir v. Malky, Inc. (In re Abir)*, No. 09 CV 2871 (SJF), 2010 WL 1169929, at *6 (E.D.N.Y. Mar. 22, 2010) ("Since the issue of what Malky was entitled to recover under the judgment of foreclosure and sale was actually and necessarily decided by the state court and the parties clearly had a full and fair opportunity to litigate that issue in the state court, and since there is no allegation that the final judgment of the state court is a product of fraud or collusion, or that the state court lacked jurisdiction, the doctrine of collateral estoppel bars appellants from relitigating their offset claim, and the amount of Malky's claim, in the bankruptcy court.").

Even if *res judicata* does not bar the debtor's challenge to the allowance of the prepayment premium, the merits do. Prepayment premiums are generally enforceable under the New York common law "rule of perfect tender in time." This rule prohibits the prepayment of the loan under the rationale that the lender has the absolute right to receive the bargained for income stream over the life of the loan. *U.S. Bank Nat'l Ass'n v. South Side House, LLC*, No. 11 CV 4135 (ARR), 2012 WL 273119, at *4 (E.D.N.Y. Jan. 30, 2012); *In Solutia, Inc.*, 379 B.R. 473, 487-88 (Bankr. S.D.N.Y. 2007); *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 835 (N.Y. Sup. Ct. 2006). The prepayment premium is viewed as the price of the option exercisable by the borrower to prepay the loan and cut off the lender's income stream, *Northwestern Mut. Life Ins. Co.*, 816 N.Y.S.2d at 835, and insures the lender

6

against loss of the bargain if interest rates decline. *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984).

The lender that accelerates the loan following a default generally forfeits the right to a prepayment premium because the acceleration advances the maturity date, and by definition, the loan cannot be prepaid. *LHD Realty Corp.*, 726 F.2d at 330-31. Where, however, a clear and unambiguous clause requires the payment of the prepayment premium even after default and acceleration, the clause will be analyzed as a liquidated damages clause. *South Side*, 2012 WL 273119, at *5; *Northwestern Mut. Life Ins. Co.*, 816 N.Y.S.2d at 836.

Section 2.3(4) of the Loan Agreement provides that "[i]f the Loan is accelerated during the Lockout Period for any reason other than casualty or condemnation, Borrower shall pay, in addition to all other amounts outstanding under the Loan documents, a prepayment premium equal to five percent (5%) of the outstanding balance of the Loan." Although the debtor asserts that the clause is not sufficiently clear to permit a post-acceleration prepayment premium, § 2.3(4) is unambiguous. The debtor does not insist that its loan was accelerated due to casualty or condemnation, and in all other circumstances, the Loan Agreement requires the debtor to pay the 5% prepayment premium. Accordingly, the 5% prepayment premium is recoverable unless it is an unenforceable penalty rather than an enforceable liquidated damages clause.

Whether a clause which prescribes liquidated damages is in fact an unenforceable penalty is a question of state law. *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 141 (2d Cir. 1982); *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*, 23 B.R. 104, 111 (Bankr. S.D.N.Y. 1982). A liquidated damages clause is valid under New York law if: (1) actual damages are difficult to determine, and (2) the sum is not "plainly disproportionate" to the

7

possible loss. *United Merchants*, 674 F.2d at 142 (quoting *Walter E. Heller & Co. v. Am. Flyers Airlines Corp.*, 459 F.2d 896, 899 (2d Cir. 1972)); *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir. 1982). The enforceability of a liquidated damages provision must be decided based on the circumstances existing at the time the parties entered into their agreement. *Walter E. Heller*, 459 F.2d at 898-99.

The party seeking to avoid the liquidated damages clause bears the burden of proving that it is a penalty, and must demonstrate either that the damages flowing from prepayment were readily ascertainable at the time the parties entered into the lending agreement or the prepayment premium is "conspicuously disproportionate" to the lender's foreseeable losses. *JMD Holding Corp. v. Congress Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005). This burden must be considered in light of the admonition that the historical distinction between liquidated damages and penalties has become increasingly difficult to justify, and courts should not interfere with the parties' agreement regarding liquidated damages "absent some persuasive justification." *GFI Brokers, LLC v. Santana*, No. 06 Civ. 3988 (GEL), 2009 WL 2482130, at *2 (S.D.N.Y. Aug. 13, 2009) (Lynch, J.) (internal citation and quotation marks omitted); *JMD Holding Corp.*, 828 N.E.2d at 609-10.

Although the *Objection* characterized the prepayment premium as a penalty, it did not contend that GECC's damages were readily ascertainable or that the premium was conspicuously disproportionate to GECC's foreseeable losses at the time the parties entered into the Loan Agreement. In response, however, to GECC's characterization of the prepayment premium as a "reasonable liquidated damages clause," (*see General Electric Capital Corporation's Response to the Debtor's Objections to Various Aspects of the Secured Claim of General Electric Capital Corporation*, dated Apr. 26, 2012, at 11 (ECF Doc. # 249)), the debtor took the position that

8

although the prepayment premium triggered after the Lockout Period was based on a complicated formula, the prepayment premium during the Lockout Period was a straight 5% with no effort to estimate the actual damages. (*Reply* at 8.) The debtor concluded, without more, that "the prepayment is definition [*sic*] out of proportion to damages actually incurred by GECC and cannot be enforced." *Id.*

  The debtor has failed to offer any proof that at the time that the parties entered into the Loan Agreement, GECC's damages resulting from a default during the Lockout Period were readily ascertainable. The prepayment premium was designed to compensate GECC for the lost stream of interest payments. GECC's damages would depend on future changes in interest rates, which were not readily ascertainable at the inception of the Loan Agreement. In addition, had the debtor actually prepaid the loan, GECC would at least have had the principal to invest elsewhere. However, the debtor did not pay the loan, and GECC lost the use of its money as well as its income stream. The parties may well have contemplated that a quick default would be followed by a costly delay in payment, and factored that into the premium.

  The debtor has also failed to show that the 5% prepayment premium was "conspicuously disproportionate" to GECC's foreseeable damages in the event of a default and acceleration during the Lockout Period. The debtor's conclusory statement that the prepayment premium is disproportionate to the actual damages suffered misses the point; the test is the foreseeable damages at the time of contracting and not the actual damages at the time of the breach. In any event, the debtor failed to show that the 5% prepayment premium is disproportionately greater than the premium under the Make Whole formula because it never computed the latter number. Under the circumstances, there is no persuasive justification for disturbing the bargain struck by the parties.

9

**B.    The Appropriate Interest Rate**

GECC is oversecured, and its right to post-petition, pendency interest is governed by 11 U.S.C. § 506(b), which states:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

Although § 506(b) entitles GECC to post-petition interest, it does not establish the appropriate rate. *In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011); *United States Trust Co. of N.Y. v. LTV Steel Co. (In re Chateaugay Corp.)*, 150 B.R. 529, 538 (Bankr. S.D.N.Y. 1993).[4] The great majority of courts have concluded that the appropriate rate should be the one provided in the parties' agreement or the applicable law under which the claim arose, the so-called "contact rate" of interest. *In re Urban Communicators PCS Ltd. P'ship*, 379 B.R. 232, 251-52 (Bankr. S.D.N.Y. 2008); *see generally* 4 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 506.04[2][b][i], at 506-102 & n.37 (collecting cases) (16th ed. 2012).

In the case of contracts, courts nevertheless have very limited discretion to deviate from the interest rate imposed under the contract. *Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998) ("The appropriate rate of pendency interest is therefore within the limited discretion of the court."). Thus, if an agreement fixes a rate, courts have recognized a rebuttable presumption that the contract rate applies post-petition, subject to adjustment based on

---

[4]    The phrase "the agreement or State statute" modifies "reasonable fees, costs, or charges," not "interest." *Cf. United States v. Ron Pair Enters., Inc.*, 489 U.S. 241-42 (1989) (interpreting earlier version of § 506(b) that "allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose").

10

equitable considerations. *In re 785 Partners LLC*, No. 11-13702 (SMB), 2012 WL 1154282, at *5 (Bankr. S.D.N.Y. Apr. 9, 2012) (collecting cases).

Courts have followed the same approach when state law fixes the rate of interest. *See Chateaugay*, 150 B.R. at 539-40 ("[T]he the rate of post-petition interest on noncontractual oversecured claims, such as state tax liens, should be determined by reference to applicable state law."). For example, tax liens accrue post-petition interest at the rate fixed by the statute that created the lien, unless equitable considerations require the imposition of a lower rate. *E.g*, *In re Coney Island Amusement, Inc.*, No. 05 Civ. 08238 (LBS), 2006 WL 617979, at *1 (S.D.N.Y. Mar. 13, 2006) ("[W]hen determining the rate of post-petition interest due oversecured tax lien claimants, 'a bankruptcy court is not necessarily bound by the state statutory rate, but should be reluctant to deviate from that rate except in very limited circumstances.'") (quoting *In re P.G. Realty Co.*, 220 B.R. 773, 778 (Bankr. E.D.N.Y. 1998)); *In re Chang*, 274 B.R. 295, 304 (D. Mass. 2002) (allowing post-petition interest on a tax lien at the higher statutory rate where the post-petition period was brief, the statutory interest was *de minimis* and one of the largest creditors did not file a claim, freeing up money to pay the statutory interest rate); *Wasserman v. City of Cambridge*, 151 B.R. 4, 5-6 (D. Mass. 1993) (allowing post-petition interest on a tax lien at the lower federal judgment rate because the debtor was insolvent and the higher statutory rate would "cause the unsecured creditors a direct harm by diminishing the value of the estate from which they hope to draw"); *Marc Stuart Goldberg, P.C. v. City of New York (In re Navis Realty, Inc.)*, 193 B.R. 998, 1017-18 (Bankr. E.D.N.Y. 1996) (A Court should award post-petition interest on an oversecured tax lien at the statutory rate unless the rate is a penalty or equity mandates a deviation from the statutory rate.).

11

GECC contends that its Judgment should bear interest at the New York statutory rate of 9% per annum.  *See* CPLR §§ 5003, 5004.[5]  As in the case of oversecured tax liens, the presumptive interest rate under 11 U.S.C. § 506(b) is the statutory rate subject to adjustment based on equitable considerations.  Equitable adjustment has been limited to four circumstances: "where there has been misconduct by the creditor, where application of the statutory interest rate would cause direct harm to the unsecured creditors, where the statutory interest rate is a penalty, or where its application would prevent the Debtor's fresh start."  *P.G. Realty, Inc.*, 220 B.R. at 780; *see 785 Partners LLC*, 2012 WL 1154282, at *5 (discussing the equitable considerations relevant to adjusting the interest rate imposed under an agreement).  The debtor bears the burden of rebutting the presumptive, "contract rate."  *785 Partners LLC*, 2012 WL 1154282, at *5.

The debtor has again failed to sustain its burden.  GECC is not guilty of misconduct, and the debtor does not contend that the statutory rate is a penalty.  Furthermore, the debtor is liquidating, and will not require or receive a fresh start.  The prejudice to the unsecured creditors is a closer question.  The debtor sold the Hotel for $82 million.  The Judgment was entered approximately one year ago, and the application of the 9% rate will increase GECC's claim to roughly $80.7 million.  On its face, this would render the debtor insolvent—possibly administratively insolvent; the debtor's administrative and priority tax claims total roughly $3

---

[5]     Both parties take for granted that the annual rate dictated by New York law is 9%.  GECC's position implies that its loan, which bore interest at a greater rate, merged into the Judgment and no longer provides a contractual basis to recover the higher rate.  *See In re Lehal Realty Assocs.*, 112 B.R. 588, 589 (Bankr. S.D.N.Y. 1990).  In addition, CPLR § 5001(a) provides that "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."  There is authority that this exception applies in a mortgage foreclosure action, and the court has discretion to award interest at a different rate.  *In re 114 Tenth Ave, Assoc., Inc.*, No. 05-60099, 2011 WL 1211547, at *2-4 (Bankr. S.D.N.Y. Mar. 25, 2011) (ruling that a state court foreclosure judgment was equitable in nature, and awarding interest under 11 U.S.C. § 506(b) at the interest rate that accrued on the sale proceeds while held in escrow); *see Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 354 (N.Y. App. Div. 2009) (concluding that the lower court abused its discretion when it departed from the statutory rate of 9% which is presumed to be reasonable and awarded interest at the annual rate of 3.5%).  Neither party has argued that the Court has discretion *under state law* to modify the 9% CPLR rate, and I do not decide the issue.

million.  (*Declaration of Robert Gladstone in Support of Confirmation of First Amended Chapter 11 Plan of Reorganization Pursuant to Section 1129 of the Bankruptcy Code*, dated May 15, 2012, Ex. A (ECF Doc. # 283).)  In addition, filed unsecured claims approximate $1.4 million. [6] (*Id.*)

The debtor predicts, however, that it will receive additional funds that the Courtyard Management Corporation is holding in escrow, intends to pursue claims against the latter, and will reduce a New York City priority tax claim by $142,000.  (*Id.*)  As a consequence, the debtor's counsel argued at the confirmation hearing that the plan was feasible regardless of the outcome of the *Objection* because there will be enough money to pay all claims, including, possibly, all unsecured claims:

> Calculating all of the professional fees we hope to, depending on the outcome of the cause of action, which is really the cause of action against Courtyard and its parent company, we hope to also be able to pay all unsecured creditors in full. But as the feasibility analysis demonstrates, there will absolutely be sufficient funds to pay GECC claim in full, whatever it may be determined to be by Your Honor as well as all priority and administrative claims.

(Transcript of the hearing held May 17, 2012, at 71) (ECF Doc. # 307).)

Thus, the debtor has failed to demonstrate whether or to what extent the 9% rate will prejudice the unsecured creditors, and under all of the circumstances, has failed to convince the Court that it should adjust the presumptive statutory rate in the exercise of its discretion.[7]

---

[6] The amount of Courtyard Management Corporation's unsecured damage claim arising from the debtor's rejection of the parties' Management Agreement is unknown at this time, but the debtor predicts that it will be "inconsequential to the estate." (*Disclosure Statement for First Amended Chapter 11 Plan of Reorganization*, dated Apr. 3, 2012 ("*Disclosure Statement*"), at 17.)  A copy of the *Disclosure Statement* is attached to the *Order: (A) Approving the Disclosure Statement [etc.]*, dated Apr. 6, 2012 (ECF Doc. # 231).

[7] This is not intended to imply that a Court should adjust the "contract rate" simply because the debtor is insolvent and the unsecured creditors will not be paid in full if at all.  Most chapter 11 cases involve insolvent debtors, and such an exception would swallow up the rule that the oversecured creditor is presumptively entitled to the "contract rate."

13

Although this conclusion disposes of the interest rate issue, I add that the debtor has offered no justification for the use of the near-zero federal judgment rate as opposed to some other rate between the federal judgment rate and 9%. The federal judgment rate is recognized by most courts as "the legal rate of interest" within the meaning of 11 U.S.C. § 725(a)(5), which requires a solvent estate to pay post-petition interest to its unsecured creditors. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (Bankr. D. Del. 2004). In *Onik v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1234-35 (9th Cir.), *cert. denied*, 537 U.S. 1072 (2002), the Court identified four reasons for this rule. First, § 726(a)(5) refers to "interest at the legal rate," and principles of statutory construction indicate that Congress intended the single source to be statutory because at the time the Bankruptcy Code was enacted the "legal rate" was fixed by statute. *Id.* at 1234-35. Second, the use of the federal judgment rate promotes uniformity. *Id.* at 1235. Third, an allowed bankruptcy claim is the equivalent of a federal judgment and, therefore, entitles the holder to interest at the federal judgment rate. *Id.* Fourth, the use of the federal judgment rate assures equitable treatment among creditors and is efficient and practical. *Id.* The "legal rate" is also relevant to the "best interest of creditors test," 11 U.S.C. § 1129(a)(7), in a solvent case because the unsecured creditors are entitled to receive at least as much as they would receive in a liquidation under chapter 7. *See Coram Healthcare Corp.*, 315 B.R. at 346.

GECC's right to interest does not depend on the debtor's solvency or § 726(a)(5). Instead, it arises under § 506(b) by virtue of its oversecured status. Section 506(b) does not call for the payment of interest at a specific rate much less the "legal rate," and does not mandate the use of the federal judgment rate. *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir.) (holding that the contract rate of interest rather than the federal judgment rate is the appropriate rate under § 506(b)), *cert. denied*, 506 U.S. 917 (1992). To the contrary, we are directed to look

14

to the parties' agreement or other applicable non-bankruptcy law, a result consistent with long-standing bankruptcy jurisprudence. *See id.*; *Chateaugay*, 150 B.R. at 538. Thus, the principal rationale for using the federal judgment rate—Congress's intent to select a single statutory rate—is absent. Furthermore, there are no concerns for fairness among similarly-situated creditors or efficiency because the secured class under a plan typically consists of a single creditor and a single claim. Here, GECC is the sole member of its class. Finally, while equitable principles play a role in the selection of the appropriate pendency interest rate under § 506(b), the ability to adjust the presumptive rate is quite limited, and in this case, missing.

Accordingly, the debtor's objection to GECC's claim is overruled. The Court has considered the debtor's other arguments that are not specifically addressed above, and concludes that they lack merit.

So ordered.

Dated: New York, New York
      June 5, 2012

                                      /s/ *Stuart M. Bernstein*
                                      STUART M. BERNSTEIN
                                      United States Bankruptcy Judge